**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GOLDEN ADVENTURE SHIPPING CORP.,           )
a Wyoming corporation,                     )
P.O. Box 8877                              )
Roanoke, Virginia 24014                    )
                                           )
AND                                        )
                                           )
DR. HASSAN CHAHADEH,                       )
an individual,                             )
5225 Katy Hwy                              )
Houston, Texas 77007                       )
                                           )
  Plaintiff,                     )
                                           )
v.                                         )    **Civil Action No. _____**
                                           )
                                           )    **JURY TRIAL DEMANDED**
                                           )
ISLAMIC REPUBLIC OF IRAN,                  )
  Serve: Embassy of Switzerland (Protecting  )
    Power), 2560 Virginia Ave NW,         )
    Washington, DC 20037                  )
                                           )
CHINA INVESTMENT CORPORATION,              )
  Serve: New York Representative Office,  )
    40th Floor, 277 Park Avenue,          )
    New York, NY 10172                    )
    (service pursuant to 28 U.S.C. § 1608(b);  )
    alt. service: New Poly Plaza,         )
    No. 1 Chaoyangmen Beidajie,           )
    Dongcheng District,                   )
    Beijing, China 100010)                )
                                           )
BANK OF CHINA LIMITED,                     )
  Serve: 1045 Avenue of the Americas,    )
    New York, NY 10018                    )
                                           )
BANK OF CHINA, NEW YORK BRANCH,            )
  Serve: 1045 Avenue of the Americas,    )
    New York, NY 10018                    )

1

INDUSTRIAL AND COMMERCIAL BANK )
  OF CHINA, )
  Serve: 1185 Avenue of the Americas, )
    18th Floor, New York, NY 10036 )
       )
ICBC NEW YORK BRANCH, )
  Serve: 1185 Avenue of the Americas, )
    18th Floor, New York, NY 10036 )
       )
ICBC FINANCIAL SERVICES LLC, )
  Serve: 1633 Broadway, 28th Floor, )
    New York, NY 10019 )
       )
AGRICULTURAL BANK OF CHINA, )
  Serve: 277 Park Avenue, 30th Floor, )
    New York, NY 10172 )
       )
CHINA CONSTRUCTION BANK )
  CORPORATION, )
  Serve: 1095 Avenue of the Americas, )
    33rd Floor, New York, NY 10036 )
       )
CHINA CONSTRUCTION BANK )
  NEW YORK BRANCH, )
  Serve: 1095 Avenue of the Americas, )
    33rd Floor, New York, NY 10036 )
       )
CHINA PETROLEUM & CHEMICAL )
  CORPORATION (SINOPEC), )
  Serve: c/o UNIPEC America, Inc., )
    3050 Post Oak Blvd, Suite 900, )
    Houston, TX 77056 )
       )
UNIPEC AMERICA, INC., )
  Serve: 3050 Post Oak Blvd, Suite 900, )
    Houston, TX 77056 )
       )
SINOPEC TECH HOUSTON CENTER, )
  Serve: 3050 Post Oak Blvd, Suite 777, )
    Houston, TX 77056 )
       )
CHINA OCEAN SHIPPING COMPANY )
  (COSCO), )
  Serve: c/o COSCO Shipping (North )
    America) Inc., 100 Lighting Way, )
    Secaucus, NJ 07094 )

2

COSCO SHIPPING (NORTH AMERICA)           )
  INC.,                                  )
  Serve: 100 Lighting Way,               )
    Secaucus, NJ 07094                   )
                                         )
PUBLIC JOINT STOCK COMPANY               )
  SOVCOMFLOT (PAO SOVCOMFLOT),           )
  Serve: via OFAC blocked assets /       )
    28 U.S.C. § 1608                     )
                                         )
JSC ROSOBORONEXPORT,                     )
  Serve: via OFAC blocked assets /       )
    28 U.S.C. § 1608                     )
                                         )
                                         )
      Defendants.                        )

## COMPLAINT

1.     Plaintiffs Golden Adventure Shipping Corporation ("Golden Adventure") and Dr. Hassan Chahadeh ("Dr. Chahadeh") (collectively, "Plaintiffs"), by and through undersigned counsel, bring this action against Defendants the Islamic Republic of Iran; China Investment Corporation; Bank of China Limited; Bank of China, New York Branch; Industrial and Commercial Bank of China ("ICBC"); ICBC New York Branch; ICBC Financial Services LLC; Agricultural Bank of China; China Construction Bank Corporation; China Construction Bank New York Branch; China Petroleum & Chemical Corporation ("Sinopec"); UNIPEC America, Inc.; Sinopec Tech Houston Center; China Ocean Shipping Company ("COSCO"); COSCO Shipping (North America) Inc.; Public Joint Stock Company Sovcomflot ("Sovcomflot"); JSC Rosoboronexport (collectively, "Defendants"), under the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), 18 U.S.C. § 1961 *et seq.*; the Antiterrorism Act ("ATA"), 18 U.S.C. § 2333; general admiralty and maritime law; and applicable common law, and state as follows:

3

2.     Golden Adventure Shipping, S.A., the legal predecessor to Golden Adventure Shipping Corporation, owned and operated a commercial maritime vessel named the MV Rubymar.

3.     Golden Adventure Shipping Corporation is a Wyoming corporation whose sole shareholder is Dr. Hassan Chahadeh, a United States citizen and an anesthesiologist residing in the State of Texas.

4.     On February 18, 2024, the MV Rubymar was transiting through international waters in the International Strait of Bab el-Mandeb in the Red Sea, bound for Bulgaria with a cargo of approximately 21,000 metric tons of ammonium phosphate sulfate fertilizer valued at approximately $10.5 million to $12.5 million. Without provocation, Houthi rebels fired an Iranian-designed Asef anti-ship ballistic missile—a derivative of Iran's Khalij Fars system, as subsequently identified by the United States Central Command—at the MV Rubymar, causing catastrophic hull damage. The solid propellant powering this weapon was manufactured using Chinese-supplied chemical precursors, including sodium chlorate and sodium perchlorate, procured in part through financial channels maintained by the Chinese banking Defendants named herein. Despite efforts to organize a rescue, the MV Rubymar sank on March 2, 2024, after being evacuated by her crew.

5.     The People's Republic of China ("China" or "PRC") is the architect and one of the key beneficiaries of the conspiracy described in this Complaint. Acting through its state-owned enterprises, state-owned banks, and state investment fund, the PRC has orchestrated a systematic arrangement with Iran and the Houthis within which: Iranian crude oil is purchased at a discount by Chinese state-controlled entities; the revenues from those purchases flow through Chinese financial institutions and fund the IRGC and its Houthi proxy; the Houthis attack non-

4

Chinese commercial shipping, suppressing competition and raising freight rates for the benefit of Chinese carriers; and Chinese-flagged vessels transit the Red Sea under a formal safe passage agreement extracted from the Houthis as the price of China's continued financial support. The PRC is not named as a defendant in this action, but its direction and control of the named Chinese Defendants, and its direct receipt of the conspiracy's commercial benefits, are pleaded throughout as essential context for the enterprise and as support for alter ego and agency theories relevant to each Chinese Defendant's liability.

6.      Defendants have collectively entered into a conspiracy to restrict and control commercial shipping in the Red Sea, in violation of international freedom of navigation and the Hobbs Act, 18 U.S.C. § 1951. This conspiracy consists of the Houthi military forces—armed, resourced, and equipped by Defendants—acting in exchange for restricting maritime commerce over which the United States has jurisdiction, within the meaning of 18 U.S.C. § 1951(b)(1), for the benefit of the conspiracy's participants.

7.      The structure of the Defendants' conspiracy has been further corroborated by events unfolding since the recent commencement of Operation Epic Fury. On March 26, 2026, Iran's Foreign Minister Abbas Araghchi publicly announced that ships owned by five specifically designated "friendly nations"—China, Russia, India, Iraq, and Pakistan—would be permitted to transit the Strait of Hormuz freely, while all other commercial shipping faced an effective Iranian blockade. This Hormuz-theater safe passage arrangement is the direct counterpart of the pre-existing Houthi Red Sea safe passage arrangement described herein, and constitutes direct evidence that the Iran–China–Houthi enterprise has now extended its chokepoint extortion scheme from the Bab el-Mandeb to the Strait of Hormuz. COSCO Shipping Lines, a named Defendant and China's largest state-owned container carrier, was among the first

major commercial operators to attempt and ultimately complete Hormuz transits under this Chinese-flag exemption, with COSCO vessels CSCL Indian Ocean and CSCL Arctic Ocean completing confirmed transits on or about March 30, 2026—the first by a major container carrier since the conflict began.

8.     Iran has simultaneously moved to formalize the extortion mechanism it applies to non-exempted commercial shipping. Iran's parliament advanced legislation to impose transit fees of up to approximately $2 million per vessel on Strait of Hormuz transits, publicly described by Iranian parliamentarians as payment for Iranian "security" services over the strait and referred to in maritime industry reporting as the "Tehran Tollbooth." This formal legislative action confirms what the pre-war Red Sea safe passage arrangement already established: Iran and its Houthi proxy operate a systematic scheme of maritime extortion—demanding commercial and political tribute from shipping interests seeking unimpeded passage through waterways over which the United States asserts navigational rights—with Chinese state-owned entities positioned as preferred beneficiaries of the arrangement rather than its victims. The formalization of toll collection through Iranian parliamentary legislation constitutes an admission by the Iranian state that its chokepoint control policy is commercially motivated extortion, not a lawful exercise of sovereign rights over an international strait governed by UNCLOS transit passage rights.

9.     As a direct and proximate result of Defendants' concerted actions, Plaintiffs suffered the total loss of the MV Rubymar and its cargo, loss of business income, and other consequential damages in an amount to be proven at trial.

## I.   JURISDICTION AND VENUE

10.   This action arises under 28 U.S.C. § 1333, which provides that United States district courts "shall have original jurisdiction of (1) [a]ny civil case of admiralty or maritime jurisdiction."

11.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), as this action arises under federal statutes including the RICO Act, 18 U.S.C. §§ 1961–1968; and the Antiterrorism Act, 18 U.S.C. § 2333.

12.   This Court has jurisdiction over the Islamic Republic of Iran pursuant to two independent exceptions to the Foreign Sovereign Immunities Act ("FSIA"). First, pursuant to the terrorism exception, 28 U.S.C. § 1605A, Iran has been designated a State Sponsor of Terrorism since January 19, 1984, and this Court has jurisdiction over all claims arising from Iran's provision of material support for the Houthi attacks on the MV Rubymar; no commercial activity nexus to the United States is required for this independent jurisdictional basis. Second, and independently, this Court has jurisdiction pursuant to the commercial activity exception, 28 U.S.C. § 1605(a)(2), as this action is also based upon acts by Iran outside the territory of the United States in connection with Iran's commercial activity of selling crude oil to Chinese entities—activity generating revenues that fund Iran's military and proxy operations—that cause a direct effect in the United States, including the destruction of a vessel owned by a United States national. The United States Government's commencement of Operation Epic Fury on February 28, 2026, premised on Iran's material support for terrorism, constitutes an executive-branch determination fully consistent with and corroborating this Court's jurisdiction under § 1605A.

13.   This Court has jurisdiction over each Chinese Defendant—China Investment Corporation, Bank of China Limited, Bank of China New York Branch, Industrial and

Commercial Bank of China, ICBC New York Branch, ICBC Financial Services LLC, Agricultural Bank of China, China Construction Bank Corporation, China Construction Bank New York Branch, China Petroleum & Chemical Corporation, UNIPEC America, Inc., Sinopec Tech Houston Center, China Ocean Shipping Company, and COSCO Shipping (North America) Inc.—exclusively pursuant to the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2). The People's Republic of China is not named as a defendant in this action, and no claim herein relies on the FSIA terrorism exception with respect to any Chinese Defendant. Jurisdiction over each Chinese Defendant is based upon: (a) commercial activity carried on in the United States by that Defendant, including the operation of federally licensed U.S. banking branches, U.S.-registered subsidiaries conducting commodity trading or broker-dealer operations, and U.S.-listed securities; and (b) acts by the Chinese Defendants outside the territory of the United States—specifically, the processing of Iranian oil revenues through Chinese financial institutions and the supply of missile propellant precursor chemicals to Iran—in connection with the Chinese Defendants' commercial activities, which acts caused a direct effect in the United States, including the destruction of a vessel owned by a United States national and the consequent financial losses to United States persons.

14.    The Chinese Defendants' U.S.-based commercial activity is substantial and continuous. Each named Chinese banking Defendant maintains federally licensed branches or registered subsidiaries in New York with billions of dollars in U.S. assets, processes U.S. dollar-denominated transactions through the U.S. financial system, and is subject to regulation by the Office of the Comptroller of the Currency, the Federal Reserve, the SEC, and/or FINRA. This U.S. commercial activity is directly connected to the Iranian oil revenue pipeline described herein, because the U.S. dollar-clearing and correspondent banking functions performed by these

8

entities in the United States are the essential mechanism through which Iranian oil revenues are converted into internationally usable funds that finance the IRGC and its Houthi proxy. The causal chain from the Chinese Defendants' U.S. commercial banking activity to the destruction of the MV Rubymar is pleaded with particularity in Section IV below.

15.    This Court has jurisdiction over Sovcomflot and Rosoboronexport, agencies and instrumentalities of the Russian Federation, pursuant to the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2). Russia is not a designated State Sponsor of Terrorism, and no claim herein relies on the FSIA terrorism exception with respect to Russia or its instrumentalities. Sovcomflot engaged in commercial activity in the United States, including dollar-denominated financial transactions processed through United States correspondent banks and vessels calling at United States ports, and committed acts outside the territory of the United States in connection with that commercial activity—specifically, its participation in the Red Sea safe passage arrangement—that caused a direct effect in the United States, including the disruption of commerce conducted by United States-owned vessels and United States nationals.

16.    This Court additionally has personal jurisdiction over Sovcomflot because all property and interests in property of Sovcomflot that are in the United States or in the possession or control of United States persons are blocked pursuant to Executive Order 14024 (February 23, 2024) and the re-designation under Executive Order 14024 (January 10, 2025). On information and belief, Sovcomflot's blocked property within the United States constitutes attachable assets subject to this Court's jurisdiction. Plaintiffs will seek to enforce any judgment through applicable statutory mechanisms, including the Terrorism Risk Insurance Act ("TRIA") to the extent Sovcomflot's blocked assets satisfy TRIA's eligibility requirements, and through other applicable execution remedies.

17.     This Court additionally has personal jurisdiction over Rosoboronexport because Rosoboronexport has been designated as a Specially Designated National ("SDN") by OFAC since July 16, 2014, pursuant to Executive Order 13661, with additional designations under Executive Order 14024 and the Iran Conventional Arms Executive Order. All property and interests in property of Rosoboronexport within the United States are blocked. Rosoboronexport previously conducted transactions with United States government agencies and financial institutions, and its acts outside the United States in connection with arms trafficking have caused direct effects in the United States.

18.     This Court has personal jurisdiction over China Investment Corporation ("CIC") pursuant to the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2), because CIC holds substantial assets in the United States, including United States Treasury securities and other dollar-denominated investments, as part of its commercial mandate to invest China's foreign exchange reserves in international markets. CIC is not a central bank or monetary authority; it is a state-owned commercial investment fund that actively deploys capital for investment return, and its U.S.-based investment activities constitute "commercial activity carried on in the United States" within the meaning of § 1605(a)(2). Plaintiffs note that 28 U.S.C. § 1611(b)(1) exempts from execution "property of a foreign central bank or monetary authority held for its own account," but CIC is not a central bank; its U.S. holdings are subject to execution under § 1610 to the extent they constitute or are connected to CIC's commercial activity, and Plaintiffs will address any § 1611 execution arguments at the appropriate stage of proceedings.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state or political subdivision thereof may be brought

"in the United States District Court for the District of Columbia." Venue is also proper pursuant to 28 U.S.C. § 1391(b)(3) and § 1391(c)(3).

20.     This Court has personal jurisdiction over all non-sovereign Defendants that maintain offices, branches, subsidiaries, agents, or other operations within the United States, as detailed below, and over foreign sovereign agencies and instrumentalities as provided by the applicable exceptions to the FSIA.

## II.     PARTIES

### A.     Plaintiffs

21.     Golden Adventure Shipping Corporation is a Wyoming corporation and the legal successor in interest of Golden Adventure Shipping, S.A., a Marshall Islands corporation. Its principal place of business is in the State of Wyoming.

22.     Dr. Hassan Chahadeh is a citizen and resident of the State of Texas and the sole shareholder of Golden Adventure Shipping Corporation. Dr. Chahadeh is a United States national within the meaning of 18 U.S.C. § 2333.

### B.     The Islamic Republic of Iran

23.     The Islamic Republic of Iran ("Iran") is a foreign state within the meaning of the FSIA. Iran was designated as a State Sponsor of Terrorism by the United States Department of State on January 19, 1984. This Court has jurisdiction over Iran pursuant to both the terrorism exception, 28 U.S.C. § 1605A, and independently pursuant to the commercial activity exception, 28 U.S.C. § 1605(a)(2), as more fully set forth in Section I above. Iran's IRGC has provided extensive and continuous material support to the Houthi organization, including the weapons systems that destroyed the MV Rubymar. The United States Government's commencement of Operation Epic Fury on February 28, 2026—targeting Iran's missile infrastructure, IRGC

11

facilities, and military leadership—constitutes an authoritative executive-branch determination that Iran's sponsorship of terrorism, including through its proxy network in Yemen, constituted a threat sufficient to justify military force, fully corroborating the factual allegations herein.

**C.      The People's Republic of China: Direction and Control of the Chinese Defendants**

24.      The People's Republic of China ("China" or "PRC") is not named as a defendant in this action. However, the PRC's direction and control of the named Chinese Defendants is integral to understanding the nature of the enterprise and the basis for each Chinese Defendant's liability, and is pleaded as factual context supporting alter ego, agency, and enterprise-membership theories.

25.      The PRC is the architect and a principal beneficiary of the conspiracy described herein. Through its 2017 National Intelligence Law, which mandates that all Chinese organizations and citizens must support, assist, and cooperate with state intelligence efforts, and through its Company Law requirement that companies with three or more CCP members establish internal Party committees to oversee operations and ensure compliance with state policies, the PRC exercises functional control over each named Chinese Defendant. Each Chinese state-owned enterprise and state-owned bank named herein operates as an instrumentality, agent, and alter ego of the PRC and the Chinese Communist Party ("CCP").

26.      The PRC has made the purchase of Iranian crude oil at a discount—and the consequent financial lifeline that sustains the IRGC and its Houthi proxy—a matter of deliberate state policy. The 2021 China-Iran Comprehensive Strategic Partnership, a 25-year agreement covering economic, security, and technological cooperation, committed China to sustained investment in Iran's energy and banking sectors in exchange for discounted crude oil. The named Chinese banking and enterprise Defendants are the instruments through which this state policy is

executed. Their conduct in facilitating Iranian oil revenues, supplying missile propellant precursors, and providing satellite access is not independent commercial activity that happens to benefit the PRC—it is coordinated state policy directed by the PRC and carried out by its instrumentalities.

27.    The PRC is the direct commercial beneficiary of the Houthi conspiracy's impact on global shipping. By suppressing maritime commerce through the Red Sea for all non-Chinese, non-Russian vessels while ensuring safe passage for its own carriers, the conspiracy has: increased the global market share of Chinese shipping companies at the expense of competitors; raised global freight rates, increasing the cost burden on non-Chinese exporters; and forced competitors to divert around the Cape of Good Hope, adding cost and delay that Chinese carriers, exempted from the Houthi campaign, do not bear. These competitive benefits flow directly to the PRC as the ultimate owner and beneficiary of the Chinese state-owned enterprises described herein. The PRC's receipt of these benefits is evidence of its direction and control of the conspiracy and of the alter ego relationship between the PRC and each named Chinese Defendant.

### D.    Chinese State-Owned Financial Defendants

28.    China Investment Corporation ("CIC") is a wholly state-owned sovereign wealth fund incorporated under Chinese Company Law. CIC maintains a New York Representative Office at 40th Floor, 277 Park Avenue, New York, NY 10172 (Tel: +1 212 230 3100), and is headquartered at New Poly Plaza, No. 1 Chaoyangmen Beidajie, Dongcheng District, Beijing, China 100010. CIC is not a central bank or monetary authority; it is a state-owned commercial investment fund that actively deploys capital for investment return. CIC had approximately $1.33 trillion in assets under management as of March 2025, including substantial holdings of United

States Treasury securities and other dollar-denominated assets acquired through commercial investment activity in the United States. CIC is the parent entity of Central Huijin Investment Ltd. ("Central Huijin"), a wholly owned subsidiary that holds majority or controlling equity interests in each of the Chinese banking defendants named herein, including ICBC, Bank of China, Agricultural Bank of China, and China Construction Bank. Through this ownership chain, CIC is the ultimate beneficial owner of the financial infrastructure used to facilitate Iran's oil revenues and the IRGC's financial operations. CIC's United States-based Treasury and investment holdings, acquired through commercial activity in the United States, constitute a primary collection target for any judgment obtained herein under the FSIA commercial activity exception.

29.      CIC and the State-owned Assets Supervision and Administration Commission ("SASAC") constitute two parallel channels through which the State Council exercises ownership and control over China's entire state-owned enterprise ecosystem: CIC/Central Huijin controls the financial sector—including the four banking Defendants named herein and Sinosure—while SASAC controls the non-financial central SOEs, including Sinopec Group and China COSCO Shipping Corporation Limited. Both channels answer to the same principal—the State Council—through the same CCP Organization Department, which controls executive appointments at both CIC-supervised financial entities and SASAC-supervised industrial enterprises by law. The identity of State Council principal is further illustrated by the revolving door between these channels: Zhang Yuzhuo, the current SASAC chairman, served as chairman of China Petroleum and Chemical Corporation (Sinopec Group)—a named Defendant herein— immediately before being appointed SASAC party secretary in December 2022 and chairman in February 2023. The movement of Sinopec's top executive into the role of regulator exercising

14

State Council ownership rights over both Sinopec and COSCO demonstrates that SASAC, Sinopec, and COSCO share the same personnel pipeline and serve the same political principal as CIC. CIC's banking subsidiaries provide the trade finance and dollar-clearing infrastructure without which SASAC-supervised enterprises—Sinopec and COSCO—cannot convert their enterprise participation into globally usable commercial value. CIC is therefore the financial apex of an enterprise whose industrial arms are separately controlled through SASAC but operationally dependent on CIC's banking infrastructure to function within the global financial system.

30.    CIC's financial connections to named Defendants Sinopec and COSCO are bidirectional and operate through three documented channels. First, through the equity channel: China Securities Finance Corporation ("CSFC"), in which Central Huijin holds a 66.70% controlling interest as confirmed in the quarterly reports of the Big Four banking defendants, is a confirmed institutional equity holder of both COSCO Shipping Holdings and Sinopec Corp. As confirmed in Sinopec Corp.'s own shareholder disclosures, China Securities Finance Corporation holds equity in Sinopec Corp. alongside Sinopec Group's controlling 69.63% stake. Since March 2025, when CSFC's controlling stake was transferred to Central Huijin from the Ministry of Finance—dramatically increasing Central Huijin's asset size from approximately 7.76 trillion yuan to at least 27 trillion yuan—Sinopec Corp.'s dividend payments to CSFC now flow: Sinopec → CSFC → Central Huijin → CIC → State Council. Sinopec Corp. paid total 2024 cash dividends representing approximately 75% of its RMB 50.313 billion profit attributable to shareholders—approximately RMB 37.7 billion ($5.2 billion) in aggregate dividend distributions—of which CSFC's equity position receives a proportional share now flowing upward through Central Huijin to CIC. The same CSFC equity pipeline applies to COSCO

Shipping Holdings: CSFC holds a documented institutional equity position in COSCO Shipping Holdings, meaning that COSCO's approximately RMB 24.7 billion in 2024 total dividends (based on the interim dividend of RMB 0.52 per share and the final dividend of RMB 1.03 per share across 15.96 billion total shares) also flow in part through CSFC to Central Huijin to CIC. Second, through the lending channel: CIC's majority-owned banking subsidiaries—Bank of China, ICBC, Agricultural Bank of China, and China Construction Bank—provide the primary trade finance, letters of credit, and shipping loan infrastructure for both Sinopec and COSCO. Bank of China's Shanghai Branch provided a CNY 1.5 billion ESG-linked syndicated loan to COSCO Shipping Energy Transportation—COSCO's tanker arm, the very fleet transiting the Red Sea under safe passage—in September 2023, five months before the Rubymar attack. The banking defendants provide Sinopec's primary trade finance and letters of credit for Iranian crude purchases, channeling capital from CIC's banking subsidiaries directly into Sinopec's NIOC procurement operations. Third, through the coordinated state action channel: on April 7–8, 2025, Central Huijin announced increased ETF and central SOE stock purchases as part of a coordinated market stabilization campaign. The Shanghai Stock Exchange confirmed that COSCO Shipping Holdings and COSCO Shipping Development each disclosed share repurchase plans in direct coordination with Central Huijin's market stabilization buying. Simultaneously, Sinopec's state-owned parent, China Petrochemical Corporation, announced a plan to purchase at least 2 billion yuan of Sinopec Corp.'s listed shares—a buyback announcement made in explicit conjunction with Central Huijin's stabilization action and publicly described as demonstrating "confidence in future growth prospects." The simultaneous coordinated announcements by Central Huijin (buying COSCO and Sinopec shares through ETFs), COSCO (announcing share repurchases), and Sinopec's parent (announcing a 2 billion yuan buyback) on

the same days—April 7–8, 2025—demonstrate the operational financial coordination among CIC, Sinopec, and COSCO at the direction of the State Council, and confirm that the financial interests of CIC/Central Huijin, Sinopec, and COSCO are aligned and mutually reinforcing as components of the same state-directed enterprise.

31.    Bank of China Limited ("Bank of China") is a state-owned multinational banking corporation headquartered in Beijing, China, the majority of which is owned by the Chinese state through Central Huijin and the Ministry of Finance. Bank of China is an agency or instrumentality of the PRC within the meaning of 28 U.S.C. § 1603(b), subject to this Court's jurisdiction exclusively pursuant to the commercial activity exception. Bank of China maintains a significant United States presence, including its New York Branch at 1045 Avenue of the Americas, New York, New York 10018, which as of December 31, 2024 held approximately $61.33 billion in total assets across its U.S. branches, constituting substantial commercial activity in the United States.

32.    Bank of China's specific role in the enterprise's financial infrastructure has been the subject of direct regulatory inquiry. In 2022, United Against Nuclear Iran identified Bank of China as one of six Chinese banks suspected of maintaining U.S. dollar-denominated accounts ultimately controlled by Iranian financial institutions sanctioned by the United States, including Shahr Bank (designated by OFAC as an SDN on October 8, 2020 for operating in Iran's financial sector) and Parsian Bank (designated as an SDN under Executive Order 13224 in 2018 for financing entities supporting the IRGC's Basij paramilitary force). Bank of China declined to respond to that inquiry and has not publicly denied maintaining such accounts. Bank of China additionally serves as a primary trade finance provider for UNIPEC, a named Defendant and Sinopec's wholly owned commodity trading arm, through letters of credit and trade finance

facilities financing UNIPEC's crude oil purchases, including purchases from shadow fleet cargoes of Iranian-origin oil relabeled as Malaysian or Omani origin. These New York Branch trade finance operations constitute a domestic nexus connecting Bank of China's U.S. commercial activity to the Iranian oil revenue pipeline within the meaning of the FSIA commercial activity exception, 28 U.S.C. § 1605(a)(2).

33.     Bank of China, New York Branch is the primary United States branch of Bank of China Limited, located at 1045 Avenue of the Americas, New York, New York 10018, regulated by the Office of the Comptroller of the Currency. The New York Branch functions as a U.S. dollar clearing center and holds assets including the building at 1045 Avenue of the Americas, owned through the subsidiary 7BP Owner LLC with total assets of approximately $875.80 million as of December 31, 2024.

34.     Industrial and Commercial Bank of China ("ICBC") is a majority state-owned multinational banking corporation headquartered in Beijing, China, with the Chinese state holding in excess of 70% of its equity through Central Huijin and the Ministry of Finance. ICBC is the largest bank in the world by total assets and is an agency or instrumentality of the PRC within the meaning of 28 U.S.C. § 1603(b), subject to this Court's jurisdiction exclusively pursuant to the commercial activity exception. ICBC maintains a United States presence through its New York Branch (a federally licensed foreign bank branch) and through ICBC Financial Services LLC. ICBC's U.S. national bank subsidiary, ICBC USA, N.A., is a separate entity that operates as a direct subsidiary of ICBC Limited and holds deposits across 14 U.S. branches in New York and California.

35.     ICBC's specific commercial connection to COSCO further establishes its role in the enterprise's financial infrastructure. In June 2005, ICBC established ICBC Credit Suisse

18

Asset Management as a joint venture with COSCO, with COSCO holding a 20% equity stake in the venture—a documented, longstanding commercial relationship between ICBC and the named shipping Defendant. ICBC's own publicly filed U.S. Resolution Plan, submitted to the Federal Reserve Board and the FDIC pursuant to Section 165(d) of the Dodd-Frank Act, confirms that the ICBC New York Branch "serves as a U.S. dollar clearing center primarily for ICBC and its subsidiary institutions outside the United States." This regulatory self-identification as the dollar clearing center for ICBC's global network establishes that COSCO's dollar-denominated freight revenues—which reached $33.29 billion in operating revenue for 2024, almost entirely dollar-denominated from international freight contracts—are cleared through ICBC's New York Branch as part of ICBC's commercial banking operations in the United States. The incremental profit of approximately $3.88 billion that COSCO earned in 2024 above its 2023 baseline—directly attributable to the Red Sea extortion scheme per COSCO's own annual report—constitutes the proceeds of Hobbs Act extortion that were processed as promotional money laundering through the ICBC New York Branch's dollar-clearing operations, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). Additionally, in September 2019, OFAC designated COSCO Shipping Tanker (Dalian) Co., Ltd. as a Specially Designated National for transporting Iranian oil in violation of U.S. sanctions—placing the entire COSCO group and all of its banking counterparties, including ICBC, on specific prior notice that COSCO's shipping operations were subject to U.S. Iran sanctions enforcement and that processing COSCO's financial transactions created Iran sanctions exposure.

36.    ICBC New York Branch is the federally licensed United States foreign bank branch of ICBC Limited, located at 1185 Avenue of the Americas, 18th Floor, New York, New York 10036, regulated by the Office of the Comptroller of the Currency. The ICBC New York

Branch is legally and operationally distinct from ICBC USA, N.A., the separately chartered U.S. national bank. The ICBC New York Branch conducts commercial banking operations in the United States including dollar-clearing, trade finance, and institutional lending.

37.     ICBC Financial Services LLC is a United States-based subsidiary of ICBC Limited providing institutional financial services including equity brokerage, custody, and financing, headquartered at 1633 Broadway, 28th Floor, New York, New York 10019. ICBC Financial Services is a registered broker-dealer with the SEC and a member of FINRA, with approximately $500 million in excess net capital as of the most recent reporting period, constituting directly attachable U.S. commercial assets.

38.     On January 19, 2024—thirty days before the Houthi missile strike that sank the MV Rubymar—the New York State Department of Financial Services and the Board of Governors of the Federal Reserve System jointly imposed a $32 million penalty on ICBC's New York Branch, finding that its OFAC sanctions compliance screening program and anti-money laundering controls "were deficient for years." The DFS and Federal Reserve specifically found that these deficiencies created the risk that transactions with OFAC-designated persons went undetected and unblocked through ICBC's New York Branch. This regulatory finding establishes that, during the precise period in which the enterprise's Iranian oil revenue pipeline was financing the Houthi attack that destroyed the MV Rubymar, ICBC's New York Branch was operating with materially deficient sanctions screening—deficiencies that ICBC's management had allowed to persist for years despite regulatory examination. The January 2024 enforcement action constitutes conclusive evidence of ICBC's general awareness, through its own regulatory proceedings, that its U.S. commercial operations presented substantial risk of facilitating transactions with OFAC-designated parties, satisfying the "general awareness" element of ATA

§ 2333(d) aiding-and-abetting liability. ICBC Financial Services LLC, as a FINRA-registered broker-dealer participating in U.S. Treasury securities clearing, provides the specific dollar-clearing mechanism through which renminbi-denominated Iranian oil revenues are converted into U.S. dollar-denominated instruments capable of interfacing with the global financial system.

39.    Agricultural Bank of China ("ABC") is a majority state-owned multinational commercial bank headquartered in Beijing, China, and an agency or instrumentality of the PRC within the meaning of 28 U.S.C. § 1603(b), subject to this Court's jurisdiction exclusively pursuant to the commercial activity exception. ABC maintains a United States presence through its New York Branch at 277 Park Avenue, 30th Floor, New York, New York 10172. Central Huijin Investment Ltd., a wholly owned subsidiary of defendant CIC, holds a controlling 40.07% equity stake in ABC, as disclosed in ABC's public annual reports. ABC's New York Branch's specific role in conducting and concealing transactions with Iranian-linked and other sanctioned counterparties has been established by United States regulatory findings. On November 4, 2016, the New York State Department of Financial Services entered a Consent Order requiring ABC to pay a $215 million penalty—the largest DFS penalty against a Chinese bank at the time—and to install an independent monitor, based on findings that ABC's New York Branch had engaged in "intentional wrongdoing" including: (a) conducting U.S. dollar clearing "in rapidly increasing volumes" through foreign correspondent accounts even after DFS explicitly warned it to cease; (b) processing "unusually large round-dollar transfers between Chinese and Russian companies" and "unusually large round-dollar payments from Yemen to companies in China"; (c) processing "potentially suspicious dollar-denominated payments from trading companies in the Middle East"; (d) omitting information from SWIFT wire messaging regarding dollar transactions "involving an Iranian party under U.S. sanctions"; and (e) silencing and curtailing the

21

independence of its chief compliance officer who attempted to investigate and stop the suspicious transactions. DFS Superintendent Maria Vullo found that ABC's conduct "created a substantial risk that terrorist groups, parties from sanctioned nations, and other criminals could have used the Bank to support their illicit activities." The Yemen-to-China payment pattern specifically identified by DFS is consistent with Houthi financial network proceeds transiting ABC's New York Branch, and the Iranian-party dollar transactions confirm ABC's pre-existing willingness to process transactions for OFAC-sanctioned Iranian counterparties through its U.S. operations. These regulatory findings establish ABC's "general awareness" of its role in processing transactions for sanctioned parties through its U.S. branch, satisfying the awareness element of ATA § 2333(d) liability, and the dollar clearing transactions themselves constitute predicate money laundering violations under 18 U.S.C. §§ 1956 and 1957 within the meaning of RICO.

40.    China Construction Bank Corporation ("CCB") is a majority state-owned multinational banking and financial services corporation headquartered in Beijing, China, and an agency or instrumentality of the PRC within the meaning of 28 U.S.C. § 1603(b), subject to this Court's jurisdiction exclusively pursuant to the commercial activity exception. CCB maintains a United States presence through its New York Branch at 1095 Avenue of the Americas, 33rd Floor, New York, New York 10036, which received a full branch license from the United States Federal Reserve in February 2009.

41.    China Construction Bank's participation in the enterprise's financial infrastructure is established through both its Central Huijin ownership ties and its direct financing of enterprise logistics infrastructure. Central Huijin Investment Ltd., a wholly owned subsidiary of defendant CIC, holds a 57.26% controlling equity stake in China Construction Bank Corporation—the

22

largest Central Huijin ownership percentage among the banking Defendants—as disclosed in CCB's public annual filings. Through this ownership, the State Council exercises direct governance authority over CCB's commercial operations through the CIC/Central Huijin chain of control. CCB's New York Branch, which received its full Federal Reserve branch license in February 2009, operates as a U.S.-regulated dollar-clearing institution constituting the upstream mechanism of the enterprise's Iranian oil revenue pipeline through its U.S. commercial banking operations. CCB's New York Branch additionally processes dollar-clearing transactions converting Iranian oil revenues and enterprise proceeds into internationally usable funds as part of the enterprise's unified U.S. dollar-clearing infrastructure.

### E.    Chinese State-Owned Enterprise Defendants

42.    China Petroleum & Chemical Corporation ("Sinopec") is a majority state-owned multinational petroleum and chemical corporation headquartered in Beijing, China, and an agency or instrumentality of the PRC within the meaning of 28 U.S.C. § 1603(b), subject to this Court's jurisdiction exclusively pursuant to the commercial activity exception. Sinopec is listed on the New York Stock Exchange and maintains substantial United States commercial operations through its subsidiaries named herein. Sinopec and its "teapot" refinery partners, acting as commercial purchasers of Iranian crude oil at a discounted market price, purchase approximately 90% of Iran's crude oil exports—approximately 42 million barrels per month—generating approximately $25–30 billion annually in revenue for Iran, directly funding the IRGC and its proxies including the Houthis. Critically, every dollar Sinopec and UNIPEC pay to Iran for crude oil is a payment to the IRGC or its agent, not merely revenue that may incidentally flow to the IRGC. On September 24, 2012, the United States Department of the Treasury determined that the National Iranian Oil Company ("NIOC")—Iran's state-owned oil monopoly and the sole

entity from which all Iranian crude oil exports originate—is an agent or affiliate of the IRGC, as confirmed by OFAC FAQ 233. NIOC was subsequently designated as a Specially Designated National on November 8, 2012 under Executive Order 13382 for providing services and support to the IRGC, and re-designated on October 26, 2020 under Executive Order 13224 (the counterterrorism authority) for financial support to the IRGC-Qods Force. OFAC confirmed at the time of designation that NIOC "provides both the oil and tankers for the sale of Iranian oil by the IRGC-QF" and that "cooperation and coordination between the IRGC-QF and [NIOC] extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF." UNIPEC, Sinopec's wholly owned trading arm and the parent of named Defendant UNIPEC America, Inc., has maintained a long-term supply contract with NIOC—an 8-year agreement commencing in 2012 for approximately 265,000 barrels per day, expanded in subsequent years to approximately 500,000 barrels per day at peak purchasing—representing the largest single commercial purchaser relationship with a designated IRGC-agent entity in the world. Because NIOC is the IRGC's agent and the exclusive conduit for all Iranian crude exports, every barrel UNIPEC purchases from NIOC and every dollar it pays to NIOC constitutes a commercial transaction with an IRGC-designated entity. The fungibility principle—explicitly recognized in OFAC's counterterrorism sanctions framework—means that money paid to an IRGC agent for oil is money available to the IRGC for any purpose, including arming and funding the Houthi proxy. The USCC confirmed in 2026 that Chinese oil purchases account for roughly 45% of Iran's government budget, meaning Sinopec's payments to NIOC fund nearly half of the Iranian government's entire budget—the same budget that Iran's 2025 law explicitly allocates to IRGC military operations under the "Strengthening National

24

Defense" program, with the IRGC-affiliated Khatam al-Anbiya Construction Headquarters authorized to receive direct crude oil deliveries.

43. Sinopec's specific role in the enterprise extends beyond its status as the world's largest purchaser of Iranian crude oil. OFAC's April and May 2025 designations of Chinese "teapot" refineries for purchasing Iranian crude identified entities operating within Sinopec's commercial supply chain as offtake partners, placing Sinopec on formal notice that its Iranian crude purchasing network had been specifically identified by the United States government as facilitating sanctions evasion. UNIPEC, Sinopec's wholly owned trading arm and the parent of named Defendant UNIPEC America, Inc., has been documented by vessel-tracking services including Kpler and TankerTrackers as the charterer and beneficial controller of shadow fleet tankers transporting Iranian-origin crude oil relabeled as Malaysian or Omani origin through ship-to-ship transfers in international waters—the specific sanctions evasion mechanism described in paragraph 94. The U.S. Treasury's February 2025 sanctions on the Sepehr Energy Jahan network specifically identified CCIC Singapore as having provided inspection and document falsification services for Iranian oil transfers to Chinese buyers at Qingdao Port, certifying Iranian-origin cargoes as Malaysian crude oil; UNIPEC America's U.S. commodity trading operations provide the American commercial nexus connecting Sinopec's shadow fleet chartering to the United States under the FSIA commercial activity exception, 28 U.S.C. § 1605(a)(2). Sinopec's New York Stock Exchange listing (ticker: SHI) and the U.S. securities interests held thereunder constitute additional assets subject to execution under 28 U.S.C. § 1610(b). The financial link between CIC's banking subsidiaries and Sinopec's Iranian oil operations is direct and specific: Bank of China, whose controlling equity is held by Central Huijin (CIC's subsidiary), is UNIPEC's primary trade finance provider, supplying the letters of

credit and commodity financing that UNIPEC requires to execute crude oil purchase transactions, including purchases from shadow fleet cargoes of Iranian-origin crude relabeled as Malaysian or Omani origin. Without Bank of China's New York Branch's trade finance and dollar-clearing operations, UNIPEC's Iranian crude purchase program cannot interface with the global financial system. This creates a direct operational link between CIC's U.S. commercial banking infrastructure and Sinopec's enterprise participation: CIC's banking subsidiaries are the essential financial enablers of Sinopec's role in the Iranian oil revenue pipeline, and CIC therefore participates in the enterprise's affairs with respect to Sinopec's predicate acts through its banking subsidiaries' U.S. commercial operations. Sinopec's systematic falsification of the origin of Iranian crude—labeling it as Malaysian or Omani to evade detection by U.S. regulators, a practice confirmed by Chinese customs data and tanker-tracking services including Kpler— constitutes documentary fraud in connection with commercial transactions, a separate predicate act supporting RICO liability. Sinopec's overseas investment subsidiary's simultaneous integration with Russia's Rosneft energy complex—the same sanctioned Russian energy infrastructure served by Defendant Sovcomflot—further establishes Sinopec's participation in a coordinated enterprise spanning Iranian oil, Russian energy, and Houthi maritime operations.

44.     The IRGC-to-Houthi funding chain that Sinopec's NIOC payments sustain is documented through multiple US government findings. Iran's 2025 budget law, whose detailed text was released on March 31, 2025, explicitly allocates a portion of Iran's oil export revenues to the armed forces under the "Strengthening National Defense" program—with the IRGC's share of oil revenues having increased significantly compared to prior years. The same budget law authorizes the IRGC-affiliated Khatam al-Anbiya Construction Headquarters and institutions under Supreme Leader Khamenei's office to receive crude oil deliveries directly from the state—

meaning Iranian oil revenues from Sinopec's UNIPEC payments are converted directly into IRGC institutional assets by Iranian law. The financial chain from Sinopec's crude oil purchases to Houthi military operations is therefore not speculative but is documented at each link: (1) UNIPEC pays NIOC for Iranian crude under long-term contract; (2) NIOC, designated as an IRGC agent by OFAC, coordinates oil revenue collection with the IRGC-QF per OFAC's October 2020 designation; (3) Iran's budget law allocates oil revenues to IRGC military operations as a matter of Iranian statutory law; (4) the IRGC-QF funds, arms, trains, and directs the Houthi organization, providing the ballistic missiles and military support enabling Houthi attacks on commercial shipping, as confirmed by United States Central Command; and (5) the Houthis deploy those IRGC-supplied weapons against commercial vessels including the MV Rubymar. Each payment UNIPEC makes to NIOC—regardless of its stated purpose as a commercial crude oil purchase—advances every subsequent step of this documented chain. The OFAC designation of NIOC as an IRGC agent placed Sinopec and all of its banking counterparties on formal legal notice since September 2012 that payments to NIOC constitute transactions with the IRGC. Any claim by Sinopec that it was purchasing crude oil on commercial terms without knowledge of NIOC's IRGC designation is foreclosed by that designation's public record, which was specifically designed to put commercial counterparties on notice of the IRGC nexus.

45.    UNIPEC America, Inc. ("UNIPEC America") is a wholly owned United States subsidiary of China International United Petroleum and Chemical Co. Ltd. (UNIPEC), a member of the Sinopec Group. UNIPEC America is incorporated in the United States with its principal office at 3050 Post Oak Boulevard, Suite 900, Houston, Texas 77056, and conducts extensive commercial crude oil and petroleum products trading throughout the Americas.

46.    Sinopec Tech Houston Center ("STHC") is a United States-registered research and development subsidiary of Sinopec Corporation, incorporated in 2013, with offices at 3050 Post Oak Boulevard, Suite 777, Houston, Texas 77056.

47.    China COSCO Shipping Corporation Limited ("COSCO") is a majority state-owned multinational shipping and logistics conglomerate headquartered in Shanghai, China, and an agency or instrumentality of the PRC within the meaning of 28 U.S.C. § 1603(b), subject to this Court's jurisdiction exclusively pursuant to the commercial activity exception. COSCO is a primary commercial beneficiary of the Houthi campaign: COSCO Shipping Holdings reported a 105.7% year-on-year net profit surge for 2024, which the company's own annual report directly attributed to the "escalation of the Red Sea situation." Chinese shipping companies increased their Red Sea market share from approximately 15% pre-crisis to 24% during peak Houthi operations. Analysis of over 120 Houthi attacks reveals zero targeting of Chinese-flagged vessels. COSCO maintains extensive commercial operations in the United States through the subsidiaries identified below.

48.    COSCO's participation in the Defendants' enterprise extends beyond passive benefit to affirmative commercial coordination with the enterprise's extortion campaign. First, on or about January 8, 2024—approximately six weeks before the Houthi attack that destroyed the MV Rubymar—COSCO Shipping Lines voluntarily ceased accepting booking reservations for cargo destined for Israeli ports, publicly coordinating its commercial conduct with the Houthi campaign's stated objective of targeting commerce associated with Israel and its supporters, as reported by Bloomberg News. This voluntary cessation of bookings to Israel, made in explicit response to Houthi threats and without legal compulsion, constitutes COSCO's knowing participation in the enterprise's commercial-coercion strategy. Second, on March 28, 2024, Zhu

Tao, chief executive of COSCO Shipping Ports, publicly denied awareness of the Houthi-China safe passage arrangement reported by Bloomberg—a denial made in response to press inquiries about COSCO's relationship to the deal, constituting an implicit admission that such an arrangement existed and that COSCO's commercial conduct had attracted scrutiny for its relationship to that arrangement. Third, in March 2026, COSCO vessels CSCL Indian Ocean and CSCL Arctic Ocean deliberately broadcast their Chinese ownership status via Automatic Identification System (AIS) signaling during their Strait of Hormuz transit attempts, affirmatively invoking the Chinese-flag safe passage exemption extended by Iranian authorities—the identical mechanism that COSCO and other Chinese carriers invoked in the Red Sea throughout the relevant period. The deliberate use of national-identity AIS signaling to obtain preferential passage from the Houthis' Iranian principals constitutes COSCO's knowing, voluntary exploitation of the safe passage arrangement, not mere passive benefit. COSCO Shipping (North America) Inc. additionally entered into a National Security Agreement with the U.S. Departments of Homeland Security and Justice in 2018 as a condition of CFIUS approval for COSCO's acquisition of Orient Overseas International Ltd., reflecting a United States government finding that COSCO's U.S. commercial operations are sufficiently substantial to present national security considerations. COSCO's current corporate form is itself the product of State Council directive: the 2016 merger that created China COSCO Shipping Corporation Limited was a SASAC-directed reorganization, meaning COSCO's organizational structure as the entity that holds the Houthi safe passage arrangement and collects elevated freight revenues was designed by State Council fiat. As of March 2025, a new ownership nexus between CIC and COSCO was established. In March 2025, the controlling stakes of China Securities Finance Corporation ("CSFC") were transferred to Central Huijin Investment Ltd.—CIC's wholly owned

subsidiary—from the Ministry of Finance. CSFC is a state-backed institutional investor that holds a significant stake in COSCO Shipping Holdings alongside SASAC's controlling position. Through this transfer, Central Huijin acquired indirect beneficial ownership of COSCO Shipping Holdings, creating for the first time a dual-channel state ownership structure at COSCO: SASAC holds COSCO through the parent group, while CIC/Central Huijin holds COSCO through CSFC. This means the 105.7% profit surge that COSCO Shipping Holdings reported for 2024—directly attributed by COSCO's own annual report to the "escalation of the Red Sea situation"—flows in part through CSFC distributions to Central Huijin, and then as dividends to CIC, and then to the State Council. The direct financial pipeline is therefore: Houthi extortion → elevated freight rates → COSCO Shipping Holdings profits → CSFC distributions → Central Huijin → CIC → U.S. Treasury and equity holdings subject to execution under 28 U.S.C. § 1610(b).

49.    COSCO's banking relationships with the named banking Defendants are documented and specific. In September 2023—less than five months before the Houthi attack on the MV Rubymar—COSCO Shipping Energy Transportation Co., Ltd. (CSET), COSCO's tanker arm operating a fleet of approximately 155 tankers and 70 LNG carriers, entered into an ESG-linked syndicated loan agreement with the Bank of China's Shanghai Branch. Bank of China has additionally provided loans to COSCO's bulker arm and, in February 2025, provided an S$18 million term loan facility to COSCO Shipping International Singapore's logistics subsidiary. These documented lending relationships establish Bank of China as COSCO's primary institutional lender for fleet financing—including the very fleet of tankers that transit the Red Sea under the Houthi safe passage arrangement—and confirm that Bank of China's New York Branch provides the U.S. dollar-clearing infrastructure through which COSCO's dollar freight revenues are converted into internationally usable funds. COSCO is additionally recognized by

30

the U.S. Naval War College and CSIS as "the maritime supply arm of the People's Liberation Army," having provided logistical support to PLA Navy escort operations in the Gulf of Aden since 2008—confirming that COSCO's commercial operations are integrated into PRC military strategy and subject to PRC state direction, negating any claim of independent commercial judgment with respect to the safe passage arrangement or the enterprise's other activities.

50.     COSCO Shipping (North America) Inc. is the regional management subsidiary of COSCO for North America, headquartered at 100 Lighting Way, Secaucus, New Jersey 07094. COSCO Shipping (North America) governs approximately twenty subsidiaries and joint ventures throughout the United States, Canada, Panama, and Mexico, with additional offices in Houston, Texas and Long Beach, California.

### F.      Non-Defendant Conspiracy Participants

The following entities are not named as defendants in this action but are identified as material participants in the conspiracy. Their conduct is pleaded as part of the RICO enterprise and as predicate acts supporting liability against the named Defendants.

51.     China Export & Credit Insurance Corporation ("Sinosure") is a state-funded policy insurer headquartered in Beijing, China, operating under direct PRC state direction. Sinosure provides credit guarantees backing the Chuxin payment conduit, through which an estimated $8.4 billion in sanctioned Iranian oil payments flowed in 2024 alone, completely bypassing the U.S.-led financial system. This PRC-directed system provides the IRGC with its primary non-SWIFT funding channel and operates in parallel with and complementary to the commercial clearing services of the named banking Defendants.

52.     China Communications Construction Group ("CCCG") is a Chinese state-owned enterprise under PRC direction headquartered in Beijing, China. CCCG built the Doraleh

31

Multipurpose Port in Djibouti—a PRC-linked logistics hub that has served as a primary transshipment point for weapons and dual-use components moving to Houthi forces in Yemen. China Merchants Port Holdings Company Ltd., a subsidiary of the state-owned China Merchants Group, acquired a 23.5% stake in the Port of Djibouti S.A. and subsequently launched the $590 million Doraleh Multipurpose Port project. China's first overseas military installation, the People's Liberation Army Navy base, is strategically situated adjacent to the CCCG-built Doraleh Multipurpose Port, creating an opaque operational environment where military or intelligence-related cargo can be concealed within high-volume commercial traffic, making it functionally impossible for outside entities to distinguish between legitimate commercial shipments and illicit transshipments destined for state or non-state actors. Both the UN Office on Drugs and Crime and the World Bank have identified ports in Djibouti as key transit points for smuggling operations into Yemen. In November 2025, Yemeni Coast Guard forces seized two wooden vessels that had departed from Djibouti Port bound for a non-authorized landing point known for smuggling; onboard were fourteen boxes of advanced Huawei telecommunications equipment not listed in the shipping manifest, assessed as capable of providing the fiber-optic backbone for the command, control, communications, and intelligence network that enables Houthi anti-ship ballistic missile and drone operations. In August 2025, Yemeni Security Belt Forces separately intercepted Chinese-made prefabricated cranes transiting a known smuggling route, assessed as intended to replace logistics infrastructure at the Houthi-controlled port of Hodeidah. Additionally, a Russian-flagged vessel carrying grain from the sanctioned terminal in Russian-occupied Crimea received clearance from the United Nations Verification and Inspection Mechanism (UNVIM) in Djibouti and was permitted to proceed to the Houthi-

controlled port of Saleef, demonstrating the exploitation of humanitarian inspection channels for illicit transshipment.

53.     Chang Guang Satellite Technology Co. Ltd. ("CGSTL") is a Chinese satellite technology company operating under PRC direction, sanctioned by the United States in 2023 and again in April 2025 for providing commercial satellite imagery services to the Houthi organization enabling targeting of U.S. naval assets and international shipping in the Red Sea. On information and belief, CGSTL's imagery services contributed to Houthi targeting capabilities during the period in which the attack on the MV Rubymar occurred. CGSTL operates the Jilin-1 satellite constellation, which provides commercial satellite imagery that has been used by Houthi forces for targeting of international shipping. The provision of this targeting data by a Chinese entity, in combination with Russian satellite targeting data transmitted through IRGC personnel as described below, gave Houthi forces the precision intelligence necessary to strike specific commercial vessels transiting the Red Sea.

54.     Shenzhen Jinghon Electronics Limited was sanctioned by the United States Treasury Department on October 2, 2024, pursuant to Executive Order 13224, for supplying dual-use components for Houthi missile and unmanned aerial vehicle production.

55.     Shenzhen Rion Technology Co., Ltd. was sanctioned by the United States Treasury Department on October 2, 2024, pursuant to Executive Order 13224, for sourcing critical components for Houthi missile and unmanned aerial vehicle development. On December 19, 2024, Treasury confirmed that Houthi operatives located in Yemen and the People's Republic of China play crucial roles in facilitating the movement of weapons and dual-use components into Yemen. On June 17, 2024, Treasury designated Guangzhou Tasneem Trading Company Limited, a PRC-based Houthi-affiliated entity, and confirmed that the Houthis have

coordinated with PRC-based firms Ningbo Beilun Saige Machine Co., Ltd. and Dongguan Yuze Machining Tools Company Limited to procure materials critical for manufacturing UAVs and other weapons.

56.    Guangzhou Yakai International Freight Forwarding Co., Ltd. was sanctioned by the United States Treasury Department on September 11, 2025, pursuant to Executive Order 13224, for shipping military-grade components from Chinese suppliers to Houthi forces in Yemen.

57.    Guangzhou Nahari Trading Co., Ltd. was sanctioned by the United States Treasury Department on September 11, 2025, pursuant to Executive Order 13224, for facilitating transport of dual-use goods and military components to the Houthis. Treasury's September 11, 2025 action also designated Al-Hammadi Trading, Shipping, and Clearance Co., Ltd., a China-based Houthi-associated logistics company that procured and shipped dual-use components from China in support of the Houthis' military efforts.

58.    Shanghai Saint Logistics Limited is a PRC-based entity sanctioned by the U.S. Treasury for acting as a general sales agent for Iran's Mahan Air, a Specially Designated Global Terrorist entity designated for providing material support and transportation services to the IRGC-Qods Force. This establishes a confirmed, sanctioned link between the PRC logistics sector and the IRGC-QF's primary air transport arm.

48D.    Semiconductor Manufacturing International Corporation ("SMIC") is the People's Republic of China's largest state-linked semiconductor company. United States State Department officials have reported that SMIC spent nearly a year supplying chipmaking equipment to Iran's military, with those transfers adding direct technical capacity to Iran's missile and weapons manufacturing programs. These technology transfers, coordinated with or

34

facilitated by PRC state direction, further establish the nexus between the Chinese technology sector and Iran's weapons production infrastructure that funds the IRGC and its Houthi proxy. On information and belief, SMIC's transfers of advanced semiconductor manufacturing equipment to Iran's military occurred during the same period in which the named Chinese banking Defendants were processing Iranian oil revenues through their U.S.-licensed branches, and constitute additional evidence of the coordinated, PRC-directed character of the enterprise described herein. SMIC is identified as a non-defendant enterprise participant whose conduct is pleaded as additional context for the enterprise's scope and the named Defendants' knowing participation therein; Plaintiffs reserve the right to seek leave to name SMIC as an additional defendant upon completion of relevant discovery.

### G.    Russian State Entity Defendants

59.    Public Joint Stock Company Sovcomflot ("Sovcomflot" or "SCF") is the Russian Federation's largest state-owned shipping company, headquartered in Saint Petersburg, Russia, and an agency or instrumentality of the Russian Federation within the meaning of 28 U.S.C. § 1603(b). Russia is not a designated State Sponsor of Terrorism; this Court's jurisdiction over Sovcomflot rests exclusively on the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2), as set forth in Section I above. Sovcomflot was designated by OFAC as a Specially Designated National pursuant to Executive Order 14024 on February 23, 2024, and was re-designated under Executive Order 14024 on January 10, 2025. OFAC identified as blocked property 69 vessels, including 54 oil and product tankers and four liquefied natural gas tankers. All property and interests in property of Sovcomflot in the United States or in the possession or control of United States persons are blocked. Plaintiffs will seek execution against such blocked assets through applicable statutory mechanisms to the extent permitted by law.

60.     Sovcomflot is a direct beneficiary of the Houthi conspiracy. While overall transits through the Bab el-Mandeb Strait and Suez Canal plummeted approximately 75–90% from pre-2023 levels, Russian-linked tankers including Sovcomflot vessels continued to transit the Red Sea under a de facto safe passage arrangement between Russia and the Houthi organization, conferring a direct and substantial commercial advantage on Sovcomflot.

61.     Russia received the same preferential treatment as China under Iran's chokepoint exemption architecture. On March 26, 2026, Iran's Foreign Minister formally announced that ships from China, Russia, India, Iraq, and Pakistan would be allowed to transit the Strait of Hormuz. As with the pre-war Red Sea arrangement from which Sovcomflot benefited, Russia and China are the primary strategic beneficiaries of Iran's emerging dual-chokepoint control strategy. While Western and Gulf-state commercial shipping was subjected to Iranian attacks, delays, and toll demands at the Strait of Hormuz, Russian-linked and Chinese-linked vessels received preferential passage—confirming the trilateral safe-passage quid pro quo as a defining structural feature of the Defendants' ongoing enterprise. The replication of the Red Sea safe-passage model at the Strait of Hormuz establishes a pattern: Iran systematically weaponizes control of international straits to confer commercial advantages on its strategic partners and to extort commercial tribute from all other maritime commerce, in violation of UNCLOS transit passage rights and the Hobbs Act.

62.     JSC Rosoboronexport ("Rosoboronexport") is the sole state intermediary agency for the Russian Federation's exports and imports of defense-related and dual-use products, headquartered in Moscow, Russia, and an agency or instrumentality of the Russian Federation within the meaning of 28 U.S.C. § 1603(b). This Court's jurisdiction rests exclusively on the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2). Rosoboronexport has been

36

designated by OFAC as an SDN since July 16, 2014, pursuant to Executive Order 13661, with additional designations under Executive Order 14024 and the Iran Conventional Arms Executive Order. All property and interests in property within the United States are blocked. Reuters reported in September 2024 that Iran was brokering a deal between Russia and the Houthis to transfer P-800 Onyx (Yakhont) supersonic anti-ship cruise missiles. Rosoboronexport, as the Russian Federation's sole authorized state intermediary for all defense product exports under Russian law, is the entity through which any such transfer would necessarily have been authorized or facilitated under Russian law.

### III.    LEGAL FRAMEWORK

#### A.    Customary Law of the Sea

63.    Freedom of navigation is a cornerstone of the law of the sea, balancing the navigational rights of all states with the sovereignty and security interests of states bordering international straits.

64.    Transit passage is the longstanding customary international law right permitting free navigation through international straits, ensuring continuous and expeditious passage for ships and aircraft. Innocent passage is a fundamental right under customary international law, allowing ships of all states to navigate continuously and expeditiously through another state's territorial sea without prior permission, provided such passage is not prejudicial to the peace, good order, or security of the coastal state.

#### B.    United States Admiralty and Maritime Jurisdiction

65.    Article III of the United States Constitution extends federal jurisdiction to all "[c]ases of admiralty and maritime [j]urisdiction." The special maritime and territorial jurisdiction of the United States, as defined in 18 U.S.C. § 7(1), includes the high seas and any

vessel belonging in whole or in part to the United States or any citizen thereof. 18 U.S.C. § 2280 prohibits acts of violence against the safety of maritime navigation, including seizing or exercising control over a ship, committing acts of violence against persons aboard a ship, destroying a ship, or placing destructive devices on a ship when such acts are likely to endanger the safe navigation of the ship, and conspiring to commit such acts. The Admiralty Extension Act, 46 U.S.C. § 30101, extends admiralty jurisdiction to cover cases where injury or damage is caused by a vessel on navigable waters and permits civil actions brought in rem or in personam.

### C.     Racketeer Influenced and Corrupt Organizations Act

66.     The RICO Act, 18 U.S.C. §§ 1961–1968, provides for criminal and civil liability for individuals and entities that engage in a pattern of racketeering activity, or conspire to do so, through the conduct of an enterprise's affairs. Violations of the Hobbs Act, 18 U.S.C. § 1951, and conspiracy to commit such violations, are predicate felonies under 18 U.S.C. § 1961(1)(B). Violations of the federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957, are also predicate felonies. Civil liability arises under 18 U.S.C. § 1964(c), and successful plaintiffs are entitled to treble damages, costs, and reasonable attorney's fees. The Supreme Court has confirmed that economic harms to "business or property" are recoverable under § 1964(c) even when they derive from personal injuries sustained in the course of business. *Medical Marijuana, Inc. v. Horn*, 604 U.S. 593 (2025).

67.     The Hobbs Act, 18 U.S.C. § 1951, criminalizes activity that "obstructs, delays, or affects" commerce by robbery or extortion, or conspiring to do so. The Hobbs Act defines "commerce" broadly to include "all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(1). The Houthi campaign directly obstructed and affected commerce over which the United States has jurisdiction, including maritime commerce

38

conducted by United States nationals and involving United States-owned vessels transiting international straits. The PRC's orchestration of this campaign—directing its state-owned enterprises and banks to sustain the financial pipeline that armed and funded the Houthis, while extracting safe passage for Chinese carriers as consideration—constitutes extortion of international maritime commerce within the meaning of the Hobbs Act, carried out through the named Chinese Defendants acting as the PRC's instruments.

68. Events following the commencement of Operation Epic Fury confirm and amplify the Hobbs Act predicate pleaded herein. Iran has extended its chokepoint extortion architecture beyond the Red Sea to the Strait of Hormuz, threatening to simultaneously control both the Bab el-Mandeb and the Hormuz Strait—chokepoints through which approximately 20% and an additional significant portion, respectively, of global seaborne oil trade transits. A Houthi official publicly stated that closing the Bab el-Mandeb Strait "is a viable option," and Iran signaled its intent to weaponize both chokepoints in coordination. Speculation has emerged, confirmed by vessel-tracking data and Lloyd's List Intelligence reporting, that Chinese-owned vessels have been granted exemptions from the de facto Hormuz blockade, mirroring the informal immunity they enjoyed from Houthi attacks in the Red Sea. This dual-chokepoint exemption architecture—in which COSCO and other Chinese state-owned carriers receive preferential passage at both Hormuz and Bab el-Mandeb precisely because the Chinese banking Defendants fund the enterprise through Iran's oil revenue pipeline—constitutes the commercial-extortion quid pro quo at the core of the Defendants' Hobbs Act conspiracy. Iran's parliamentary legislation formalizing transit fees of up to approximately $2 million per vessel further establishes that the Defendants' chokepoint control policy is commercially motivated extortion, not a lawful exercise

of sovereign rights over international straits governed by the transit passage provisions of UNCLOS.

69.    Under the Hobbs Act, the enterprise "obtained property" in three distinct and individually pleadable forms, each satisfying the transferability requirement of extortion. First, the 2021 China-Iran Comprehensive Strategic Partnership committed China to purchase Iranian crude oil at a minimum guaranteed discount of 12% to 18% below the six-month rolling mean price of comparable benchmark products, plus additional risk-adjusted compensation, as reported by the Petroleum Economist based on the agreement draft and confirmed by the USCC's 2025 report. This contractually mandated below-market pricing is property obtained by Chinese purchasers (principally Sinopec) from Iranian counterparties—a structured transfer of economic value extracted as consideration for China's sustained political and financial support of the IRGC and its proxies. Second, the Houthi safe passage arrangement constitutes the granting to Chinese carriers of a transferable economic right—unimpeded transit of the Bab el-Mandeb and, from March 2026, the Strait of Hormuz, without attack, seizure, or toll—that the enterprise extracted from the Houthis as consideration for the named Chinese Defendants' financial support of Iran's IRGC. When COSCO transits the Red Sea without war-risk insurance premiums or Cape of Good Hope routing costs while competitors pay tens of thousands of dollars per voyage in additional costs, the enterprise has obtained for COSCO property of quantifiable economic value at the direct expense of commercial competitors whose U.S.-national-owned vessels—including the MV Rubymar—bear the full weight of the extortion campaign. Third, the elevated global freight rates generated by the Houthi campaign constitute the proceeds of extortion: COSCO Shipping Holdings' 105.7% year-on-year profit surge in 2024, directly attributed by COSCO's own annual report to the "escalation of the Red Sea situation," is the quantifiable economic

return on the enterprise's extortion of international maritime commerce. Those proceeds, having been generated by Hobbs Act extortion, constitute proceeds of a RICO predicate offense under 18 U.S.C. § 1956, and their processing through the banking Defendants' U.S.-licensed branches constitutes promotional money laundering—a further predicate act independently supporting RICO liability and tightening the domestic nexus required for both FSIA clause 1 and the Hobbs Act commerce element.

70.     Banks and financial institutions may constitute RICO enterprise members where they knowingly process financial transactions that constitute the economic infrastructure of a racketeering enterprise. The Chinese banking Defendants' knowing facilitation of Iranian oil revenues through their U.S.-licensed branches constitutes participation in the conduct of the enterprise's affairs through a pattern of racketeering activity. The knowing processing of funds derived from Iran's sanctioned oil sales through U.S.-regulated banking operations constitutes violations of 18 U.S.C. § 1956 (money laundering) and § 1957 (engaging in monetary transactions in criminally derived property), each of which is a RICO predicate act.

71.     The sinking of the MV Rubymar on March 2, 2024, was not merely a predicate act of the enterprise's RICO conspiracy—it was an integral component of the enterprise's extortion scheme, functioning as a demonstrative enforcement action designed to induce compliance and fear across the entire commercial shipping market. Under the Hobbs Act, extortion is accomplished by the wrongful use of "actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). The enterprise's scheme operates as a protection racket on an international scale: the Houthis selectively attack non-Chinese, non-Russian commercial vessels to demonstrate their capability and willingness to sink ships, inducing fear in the broader commercial shipping market that coerces compliance in the form of rerouting, payment of

41

elevated war-risk insurance premiums, payment of Houthi safe passage fees, or exit from the Red Sea route entirely. Each of these compliance responses constitutes the parting with property induced by fear that Hobbs Act extortion requires. The MV Rubymar was the first vessel fully destroyed in the Houthi campaign and received extensive international news coverage confirming its signal to the global shipping market that the Houthis possessed and would exercise the capability to sink commercial vessels. The immediate market response—including the suspension of Red Sea transits by Maersk, MSC, Hapag-Lloyd, CMA CGM, and other major carriers—demonstrates that the attack on the MV Rubymar achieved its intended effect of inducing fear across the commercial shipping market and causing those carriers to part with property (the economic value of efficient Suez routing) through compliance with the enterprise's implicit demands. Plaintiffs' own loss is therefore both a direct injury and a component of the broader extortion mechanism: the conspicuous destruction of a U.S.-national-owned vessel carrying cargo through the Bab el-Mandeb sent the clearest possible signal to the market that no vessel—regardless of flag, cargo, or owner nationality, unless Chinese or Russian—was immune from attack. This selective enforcement targeting, which destroys competitors' vessels while sparing Chinese-flagged carriers, is precisely the mechanism through which a protection racket enforces compliance: the violence is not random, it is calibrated to demonstrate power, establish credibility, and reinforce the commercial value of the enterprise's protection to those who have paid for it.

72.     Wire fraud under 18 U.S.C. § 1343 is a RICO predicate act under 18 U.S.C. § 1961(1)(B). Each transmission by wire—including SWIFT wire messaging and electronic trade finance communications—of a materially false document in furtherance of a scheme to defraud constitutes a separate predicate act. The enterprise's systematic falsification of Iranian crude oil's

country of origin—certifying Iranian-origin cargoes as Malaysian or Omani crude through document falsification services confirmed by OFAC to have been provided by CCIC Singapore and Huangdao Inspection and Certification Co., Ltd., and through AIS transponder manipulation by shadow fleet tankers disabling position reporting during ship-to-ship transfers—constitutes a scheme to defraud executed by wire. Each false certificate of origin transmitted by wire to a U.S.-regulated financial institution to obtain a letter of credit or trade finance facility is an independent wire fraud predicate act. Agricultural Bank of China's New York Branch additionally transmitted SWIFT wire messages omitting material information about transactions involving Iranian parties under U.S. sanctions, as confirmed by the November 2016 DFS Consent Order—each such transmission is an independent wire fraud predicate act occurring in the United States. 18 U.S.C. § 2280 (acts of violence against maritime navigation, including destroying a ship or conspiring to do so), which appears as racketeering activity under 18 U.S.C. § 1961(1)(F) as an offense under Chapter 111 of Title 18, is also a predicate act. The Houthi missile attack on the MV Rubymar on February 18, 2024, which destroyed the vessel, constitutes a violation of § 2280, and the named Defendants' conspiracy to enable that attack through financial and material support constitutes conspiracy to commit a § 2280 offense—an additional independent RICO predicate strengthening the pattern of racketeering activity. The pattern of wire fraud and § 2280 predicate acts substantially predates the MV Rubymar attack, extends across years of the enterprise's operation through hundreds of individual wire transmissions, and satisfies the continuity requirement of 18 U.S.C. § 1961(5).

## D.    Antiterrorism Act and JASTA

73.    The Antiterrorism Act of 1992, 18 U.S.C. § 2333, authorizes private actions by United States nationals against those who commit, aid, or abet acts of international terrorism.

The Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016), added 18 U.S.C. § 2333(d), which imposes secondary liability on any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed an act of international terrorism. Banks and financial institutions may face civil aiding-and-abetting liability under § 2333(d) for providing substantial financial assistance to a designated terrorist organization with knowledge that the organization has engaged in terrorism. *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018). Section 2333(a) provides for treble damages, costs, and attorney's fees.

74.     The ATA aiding-and-abetting standard under § 2333(d) requires that a defendant: (1) be generally aware of its role in an overall illegal or tortious activity; and (2) knowingly provide substantial assistance to the principal wrongdoer. The accumulation of OFAC designations targeting Iranian oil trade participants specifically naming Chinese banking networks, the U.S.–China Economic and Security Review Commission's published findings on Chinese bank facilitation of IRGC financing, and the United States Government's invocation of Iran's terror sponsorship as the basis for Operation Epic Fury collectively establish that the Chinese banking Defendants were generally aware of their role in the broader enterprise and knowingly provided substantial assistance through their U.S. commercial banking operations.

### E.     Foreign Sovereign Immunities Act and Execution

75.     The FSIA, 28 U.S.C. §§ 1602–1611, governs the immunity of foreign states and their agencies and instrumentalities. As set forth in Section I above, this Court has jurisdiction over Iran pursuant to both the terrorism exception, 28 U.S.C. § 1605A, and independently the commercial activity exception, 28 U.S.C. § 1605(a)(2). Jurisdiction over all Chinese Defendants

44

and all Russian Defendants rests exclusively on the commercial activity exception, 28 U.S.C. § 1605(a)(2).

76.     The threshold question for the commercial activity exception is the nature of the foreign state's acts, not their purpose. 28 U.S.C. § 1603(d) expressly provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." In Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992), the Supreme Court held that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." The Court emphasized that it does not matter what kind of goods a foreign government is purchasing—"a contract to buy army boots or even bullets is a 'commercial' activity"—so long as a private party could similarly engage in the same type of conduct. Applying this test to each category of the named Chinese Defendants' conduct: (a) Purchasing crude oil at a negotiated discount is paradigmatically commercial—private commodity traders, hedge funds, and refiners purchase discounted commodities through negotiated contracts continuously, and the nature of Sinopec's Iranian crude purchases is no different from any other commodity purchasing arrangement; (b) Processing dollar payments through correspondent banking accounts, issuing letters of credit, and clearing international wire transfers are commercial banking activities in which every private bank engages as part of its ordinary course of business; (c) Booking containerized cargo on commercial shipping routes, collecting freight revenues, and operating port infrastructure are the core commercial activities of every private shipping company; (d) Providing credit insurance guarantees for trade finance arrangements is a standard commercial insurance function performed by private export credit insurers in every major economy; and (e)

45

Investing sovereign wealth fund capital in U.S. Treasury securities, equities, and private equity funds is commercial investment activity indistinguishable from that of any private institutional investor. None of these acts is "peculiar to sovereigns"—none requires the exercise of sovereign power; all can be and regularly are performed by private parties in the marketplace. The purpose for which the defendants engaged in these acts—however geopolitically significant—is irrelevant to this analysis under § 1603(d) and Weltover.

77.     Under Saudi Arabia v. Nelson, 507 U.S. 349, 357 (1993), the "based upon" requirement of 28 U.S.C. § 1605(a)(2) focuses on "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case"—the "gravamen of the complaint." In Nelson, the Court held that despite the hospital's commercial recruitment activity in the United States, the claims were not "based upon" that activity because the gravamen of the claims was the sovereign act of arrest and torture. This action is distinguishable from Nelson in a dispositive respect: the gravamen of Plaintiffs' claims against each Chinese Defendant is the Defendant's own commercial conduct, not the Houthi attack. The Houthi attack is the mechanism through which Plaintiffs suffered harm; the commercial acts of the Chinese Defendants are the foundation—the "elements that, if proven, would entitle Plaintiffs to relief." Specifically: (a) The claims against the banking Defendants are based upon those Defendants' dollar-clearing and trade finance operations through their U.S. branches—acts that constitute RICO predicate violations (money laundering, wire fraud) independently of the Houthi attack; (b) The claims against COSCO are based upon COSCO's commercial participation in the safe passage arrangement—booking and profiting from cargo diverted from extorted competitors through its U.S. commercial operations—and its voluntary cessation of bookings to Israel, both of which are commercial acts independent of the attack; (c) The claims against Sinopec are based

upon Sinopec's commercial purchase of discounted Iranian crude through contracts that generate the revenue sustaining the enterprise—a commercial transaction that would entitle Plaintiffs to relief under money laundering and Hobbs Act extortion theories regardless of what the Houthis subsequently did with those revenues; and (d) The claims against CIC are based upon CIC's ownership and direction of the banking infrastructure that processes enterprise proceeds through U.S. commercial operations—acts that constitute the financial architecture of the conspiracy and support execution under 28 U.S.C. § 1610(b). In each case, the defendant's commercial conduct is the gravamen; the Houthi attack is the downstream consequence.

78.     The safe passage arrangement at the center of this conspiracy is commercial in character, not a diplomatic or political compact immune from the FSIA's commercial activity exception. The arrangement has every attribute of a commercial contract: (a) offer—Chinese state-owned enterprises and banks offer sustained financial and material support to Iran and through Iran to the Houthi organization; (b) acceptance—the Houthis agree to grant preferential transit rights to Chinese-flagged commercial vessels while interdicting competitors; (c) consideration on both sides—financial support flowing from Chinese entities to the Houthi enterprise, and route access and competitor suppression flowing from the Houthis to Chinese carriers; and (d) performance—COSCO vessels transit the Red Sea unimpeded while Maersk, MSC, and other competitors are coerced off the route, delivering the quantifiable commercial benefits COSCO's own annual report attributes to the arrangement. The safe passage arrangement was not negotiated by foreign ministries, has no status under international law, was not ratified by any legislative body, and creates no rights or obligations under treaty or customary international law. It is a commercial deal in which Chinese entities pay for route access using financial instruments, and the Houthis deliver route access through the selective use

47

of violence. Private parties negotiate analogous access arrangements continuously—canal transit agreements, port concession contracts, charter party clauses, and protection-and-indemnity insurance arrangements all represent commercial mechanisms for securing maritime route access. The enterprise's safe passage arrangement is the same type of commercial exchange, distinguished only by the illegitimate means through which the Houthis enforce their side of the bargain. Under Weltover, the commercial character of an arrangement is determined by its nature, not its purpose or the means of enforcement. The nature of granting preferential commercial transit rights in exchange for financial support is commercial activity in which a private party could engage; the illegality of the enforcement mechanism does not transform the underlying commercial arrangement into a sovereign act. The Iranian parliament's formal legislation imposing transit fees of up to approximately $2 million per vessel at the Strait of Hormuz—the "Tehran Tollbooth"—is the Iranian state's own characterization of the arrangement as a commercial transaction: payment for a service (transit security), not an exercise of sovereign power. An enterprise whose participants themselves describe their chokepoint control as fee-for-service cannot credibly claim sovereign immunity on the ground that the arrangement is a political compact rather than a commercial one.

79.     Execution of any judgment is governed by 28 U.S.C. § 1610. Under § 1610(b), the property in the United States of an agency or instrumentality of a foreign state is not immune from execution after judgment if the agency or instrumentality has engaged in commercial activity in the United States. The Chinese banking Defendants' U.S. branch assets, ICBC Financial Services' broker-dealer capital, and the U.S. subsidiary assets of Sinopec and COSCO are each assets of agencies or instrumentalities engaged in commercial activity in the United States, subject to execution under § 1610(b). Plaintiffs acknowledge that CIC's U.S. Treasury

holdings may be subject to § 1611 execution arguments and will address any such arguments at the appropriate stage of proceedings.

## IV.    FACTUAL ALLEGATIONS

### A.  The Houthi Campaign Against International Shipping

80.    The Iran-backed Houthi rebels, also known as Ansar Allah, control much of western Yemen, including the capital Sana'a. The Houthis originated as a religious and political movement in the 1990s and launched an insurgency against the Government of Yemen in 2004.

81.    The Houthis' Red Sea campaign is not primarily ideological; their actions resemble those of a criminal syndicate seeking control over vital maritime routes for economic gain. The Houthis have institutionalized extortion practices, demanding payments from shipowners for "safe passage" through the Red Sea and Gulf of Aden, generating potentially up to $2 billion annually in illicit tolls and protection fees, often funneled through informal hawala networks. This extortion directly obstructs commerce over which the United States has jurisdiction within the meaning of the Hobbs Act, 18 U.S.C. § 1951.

82.    The Houthis' campaign against commercial shipping has involved hundreds of attempted attacks using drones, missiles, unmanned surface vehicles, small boats, gunfire, and rocket-propelled grenades. Notable incidents include: (a) November 19, 2023: MV Galaxy Leader—hijacked by Houthi commandos; 25 crew taken hostage; (b) February 18, 2024: MV Rubymar—struck by Iranian-designed Asef anti-ship ballistic missile; sank March 2, 2024; (c) March 6, 2024: MV True Confidence—hit by missile; three crew killed; (d) June 12, 2024: MV Tutor—attacked; one crew member killed; sank June 18–19, 2024; (e) July 6–9, 2025: MV Eternity C—sustained multi-day attacks; at least four crew killed, eleven missing.

83.     On January 22, 2025, the President of the United States designated Ansar Allah as a Foreign Terrorist Organization in Executive Order 14175, noting that the Houthis had "attacked commercial vessels transiting Bab al-Mandeb more than 100 times, killing at least four civilian sailors and forcing some Red Sea maritime commercial traffic to reroute, which has contributed to global inflation."

### B.  Iranian Material Support to the Houthis

84.     Iran's Islamic Revolutionary Guard Corps ("IRGC") has provided extensive military support to the Houthis since approximately 2009, including ballistic missiles, cruise missiles, drones, anti-ship systems, training, intelligence, and weapons transfers. This support enabled the Houthis to conduct advanced attacks on international shipping as part of Iran's broader "Axis of Resistance" strategy. Despite public denials, intercepted shipments and Iran's recognition of the Houthi-led government in Sana'a confirm Tehran's role as the Houthis' primary state sponsor. Iran is the sole country that recognizes the Houthi organization as the legitimate government of Yemen.

85.     The missile that struck the MV Rubymar was a solid-fuel anti-ship ballistic missile. U.S. Treasury disclosures revealed that hundreds of metric tons of missile propellant precursor chemicals—including sodium chlorate, sodium perchlorate, and sebacic acid—were procured from China since 2023 for Iran's ballistic missile program. These Chinese-supplied chemicals are essential ingredients for manufacturing the solid propellant used in the class of weapon that destroyed the MV Rubymar. The financial channels through which these procurements were made run through the same Chinese banking infrastructure described herein. On April 29, 2025, OFAC sanctioned China Chlorate Tech Co Limited ("CCT") for providing missile propellant precursor chemicals to Iran's ballistic missile program; CCT supplied sodium

chlorate and related chemicals to Iran's Parchin Chemical Industries, a Defense Industries Organization element responsible for producing the ballistic missiles transferred to the Houthis. Treasury also designated Yanling Chuanxing Chemical Plant and Dongying Weiaien Chemical as Chinese suppliers of sodium chlorate and dioctyl sebacate for Iranian missile propellant production. These procurements were coordinated through a network including UAE-based facilitator Marco Klinge and the MVM Partnership, which arranged the transport of hundreds of metric tons of missile propellant ingredients from China to Iran since 2023.

### C.  The PRC as Puppetmaster: Direction of the Chinese Defendants

86.     The PRC is not a passive observer of the conspiracy described herein. It is its architect and director. The PRC's 2021 Comprehensive Strategic Partnership with Iran—a 25-year agreement covering energy, infrastructure, banking, and security cooperation—committed China at the highest state level to sustained purchase of Iranian crude oil at a discount, sustained investment in Iran's energy and banking infrastructure, and technological cooperation that includes the dual-use satellite and missile guidance capabilities described below. The named Chinese Defendants are the instruments through which this state-level commitment is executed.

87.     The 2021 China-Iran Comprehensive Strategic Partnership's specific operative provisions confirm the enterprise's deliberate design and the named Defendants' knowing participation. Per reporting by the Petroleum Economist based on the agreement draft text, confirmed by the U.S.-China Economic and Security Review Commission's 2025 report, the agreement provides: (a) a minimum guaranteed discount of 12% to 18% below the six-month rolling mean price for all Iranian crude oil purchased by China, plus additional risk-adjusted compensation—a contractually mandated below-market transfer constituting the economic quid pro quo for China's sustained support of the IRGC's financing; (b) provisions for "advancing

51

Tehran's qualitative military capabilities" through security, intelligence, and defense cooperation, and for "acquiring Chinese weapons that can be used to support Iran's proxies in the region, whether in Yemen, Syria, Lebanon, or Iraq"—an express contractual commitment to arm the Houthi organization through Iran, directly implicating the named Chinese Defendants as instruments of this state-level commitment; and (c) the PLA and the Iranian military conducted joint maritime exercises designated "Sea Security Belt" in 2019, 2022, 2023, 2024, and March 2025—the last occurring eleven months before the MV Rubymar attack—during the same period that Iran's IRGC was providing the weapons and support the Houthis used to attack commercial shipping, demonstrating active PLA operational coordination with the same Iranian military command structure directing the Houthi campaign. In January 2025, two Iranian cargo vessels sailed from China carrying more than 1,000 tons of sodium perchlorate—a direct precursor for ammonium perchlorate used in ballistic missile solid propellant, the same chemical class identified by U.S. Treasury as essential to manufacturing the type of missile that struck the MV Rubymar. One vessel arrived in Iran in February 2025 and the other on March 29, 2025. These post-attack shipments confirm the enterprise's continued operation and the uninterrupted continuity of the same Chinese chemical supply chain that produced the attack weapon. The USCC's November 2025 report expressly confirmed that "Chinese banks, front companies, and intermediary firms facilitate oil transactions, the shadow fleet that transports Iranian oil, access to controlled technologies that support Iran's missile and drone programs, and money laundering that enables it all"—an authoritative U.S. government finding directly identifying the category of entities that includes each named banking Defendant and their role in the unified enterprise.

88.    China's 2017 National Intelligence Law mandates that all Chinese organizations must support and cooperate with state intelligence operations. China's Company Law requires

companies with three or more CCP members to establish internal Party committees that oversee operations and ensure compliance with state policy. Each named Chinese Defendant maintains such a Party committee. These structural mechanisms ensure that the conduct of the named Chinese Defendants in purchasing Iranian oil, processing its revenues, supplying missile precursors, and providing satellite access is not independent commercial judgment but coordinated state policy directed by and for the benefit of the PRC.

89.     The PRC's direction of this conspiracy is demonstrated by its results: of more than 120 Houthi attacks on commercial shipping analyzed, zero targeted Chinese-flagged vessels. This is not coincidence—it is the product of a formal agreement. Bloomberg News reported on March 21, 2024 that the Houthis reached a formal agreement with Russia and China during diplomatic talks in Oman, brokered by senior Houthi political figure Mohammed Abdel Salam, to ensure safe passage for Russian and Chinese ships through the Red Sea and Gulf of Aden. General Erik Kurilla, Commander of United States Central Command, confirmed in Congressional testimony on March 21, 2024 that "Russia and China have a bye on any movement through the Red Sea." The safe passage arrangement is the PRC's side of the bargain: in exchange for the financial, technological, and weapons support provided by the named Chinese Defendants, the Houthis attack the PRC's commercial competitors while leaving its own carriers unmolested.

90.     The commercial benefits of this arrangement flowing to the PRC and its instrumentalities are direct and quantifiable. COSCO Shipping Holdings reported a 105.7% year-on-year profit surge for 2024 that its own annual report directly attributed to the "escalation of the Red Sea situation." Chinese-affiliated shipping increased its Red Sea market share from approximately 15% to 24% while competitors diverted around the Cape of Good Hope at

substantially increased cost. The PRC's receipt of these competitive benefits—extracted through the named Defendants' participation in the conspiracy—constitutes the economic consideration for the PRC's direction and support of the enterprise, and is direct evidence of the alter ego relationship between the PRC and each named Chinese Defendant.

91.     The enterprise's commercial benefit to Chinese shipping companies extends beyond elevated freight rates to the direct capture of cargo and commerce diverted from Western and non-Chinese competitors. When Maersk, MSC, Hapag-Lloyd, and CMA CGM suspended Red Sea transits and rerouted around the Cape of Good Hope—adding approximately 10 to 14 additional sailing days per voyage and thousands of dollars in additional fuel and operating costs per transit—the cargo booked on those services did not disappear. A substantial portion of that diverted cargo transferred to COSCO and other Chinese-flagged carriers, which continued to transit the Red Sea and Suez Canal under the Houthi safe passage arrangement and could therefore offer shorter transit times, greater schedule reliability, and effectively subsidized rates to shippers choosing a Red Sea-capable carrier. The increase in Chinese carriers' Red Sea market share from approximately 15% to 24%—a 60% proportional increase in market share— represents the direct commercial capture of cargo, booking revenue, and customer relationships that would otherwise have been competed for by the non-Chinese carriers the Houthi campaign had coerced off the route. This diverted commerce constitutes "property" obtained by the enterprise for the benefit of Chinese carriers through the extortion of their competitors: the enterprise coerced Western carriers into abandoning the route through violence and fear, then provided Chinese carriers preferential access to the route the Western carriers vacated, capturing the commercial value of that route advantage. This is precisely the commercial coercion mechanism that the Hobbs Act was designed to reach: obtaining a competitor's property—their

54

market share, their cargo, their customers—through the wrongful use of actual or threatened violence against them. COSCO Shipping (North America) Inc., operating through its approximately twenty U.S. subsidiaries serving U.S. importers and exporters, received a direct commercial benefit in the United States: U.S. shippers who would have booked capacity on Maersk, MSC, or other suspended-service carriers had no competitive alternative to Chinese-flagged carriers for time-sensitive Suez-routed shipments, creating a captive customer dynamic in the United States market that COSCO's U.S. operations directly exploited. The value of this captured U.S. commerce, obtained through the enterprise's extortion of COSCO's competitors, is property obtained in the United States through the U.S. commercial operations of a named Defendant, satisfying both the Hobbs Act commerce element and the FSIA's first-clause commercial activity nexus for COSCO Shipping (North America) Inc. The captured U.S. commerce ultimately accumulates in the banking Defendants' U.S. dollar-clearing infrastructure: COSCO's dollar freight revenues from U.S. importers and exporters served by COSCO Shipping (North America)'s U.S. subsidiaries are cleared through the banking Defendants' New York branches, flow into the banking Defendants' collective $300 billion U.S. dollar securities portfolio, and are remitted upward through Central Huijin to CIC as dividends. The diverted U.S. commerce is therefore not merely a benefit to COSCO's bottom line—it is property that the enterprise obtained in the United States, processed through U.S. commercial banking operations, and accumulated in U.S.-sited assets belonging to named Defendants, completing the domestic property-obtained element of Hobbs Act extortion and the FSIA commercial activity nexus for every Chinese Defendant simultaneously.

**D.  Chinese Commercial Activity in the United States and Its Connection to the Conspiracy**

92.    The commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2), requires either that the action be based upon commercial activity carried on in the United States by the foreign state, or upon an act performed in the United States in connection with commercial activity elsewhere, or upon an act outside the United States in connection with commercial activity elsewhere that causes a direct effect in the United States. All three prongs are satisfied with respect to the Chinese Defendants. This action does not rely on the second clause of § 1605(a)(2) for any Chinese Defendant—consistent with the D.C. Circuit's narrowing of that clause in Wye Oak Technology, Inc. v. Republic of Iraq, 24 F.4th 686 (D.C. Cir. 2022), which held that the second clause requires an act by the foreign state in the United States, not merely an act by a related party. Instead, Plaintiffs invoke: (a) the first clause—commercial activity carried on in the United States—with respect to each banking Defendant's federally licensed U.S. branch operations and ICBC Financial Services LLC's U.S. broker-dealer operations, COSCO Shipping (North America) Inc.'s U.S. port, logistics, and shipping agency operations through its approximately twenty U.S. subsidiaries, UNIPEC America Inc.'s U.S. commodity trading operations at its Houston office, and CIC's U.S. portfolio management activities through its New York Representative Office; and (b) the third clause—acts outside the United States in connection with commercial activity elsewhere that cause a direct effect in the United States— with respect to the processing of Iranian oil revenues through Chinese financial institutions outside the U.S., the supply of missile propellant precursor chemicals, and the provision of satellite targeting services, each of which constitutes an act connected to each defendant's U.S. commercial activity that caused a direct effect in the United States: the destruction of a vessel owned by a United States national and the consequent financial losses to United States persons.

Under Republic of Argentina v. Weltover, 504 U.S. 607 (1992), a direct effect exists when a legally significant act required to be performed in the United States is not performed there. Each defendant's U.S. commercial banking operations are the legally significant locus at which Iranian oil revenues must be dollar-cleared to interface with the global financial system—removing those U.S. operations eliminates the enterprise's ability to convert sanctioned revenues into internationally usable funds, making the U.S. branch the necessary place of commercial performance whose omission or malperformance causes a direct effect in the United States.

93.     China is the primary economic lifeline of the Islamic Republic of Iran. Chinese entities purchase approximately 90% of Iran's crude oil exports—approximately 42 million barrels per month—at a commercially negotiated discount of approximately $8–10 per barrel below global benchmark prices, generating approximately $25–30 billion annually in revenue for Iran. That revenue funds the IRGC, which in turn funds the Houthis. The U.S.–China Economic and Security Review Commission confirmed in 2026 that oil revenue from China accounts for roughly 45% of Iran's government budget.

94.     The Chinese banking Defendants—Bank of China, ICBC, Agricultural Bank of China, and China Construction Bank, each operating through U.S.-licensed branches or subsidiaries in New York—provide the dollar-clearing, correspondent banking, and settlement infrastructure that is indispensable to converting Iranian oil revenues into internationally usable funds. Iranian oil is typically sold in renminbi through the shadow banking network described herein, but ultimate conversion to internationally usable currency and access to the global financial system requires dollar-clearing through the U.S.-regulated banking system. The Chinese banking Defendants' U.S. branches perform this dollar-clearing function as part of their commercial banking operations in the United States. This is not incidental—it is the essential

domestic nexus connecting the PRC's conspiracy to United States jurisdiction under the FSIA commercial activity exception.

95.     The banking Defendants' U.S. dollar-clearing operations service not only Iran's sanctioned oil revenues but also COSCO's extortion-derived freight revenues, creating a dual money-laundering function that consolidates both the supply-side proceeds (Iranian oil revenues) and the demand-side proceeds (elevated freight revenues) of the enterprise through the same U.S. commercial banking infrastructure. COSCO Shipping Holdings reported operating revenue of $33.29 billion for 2024, an increase of 33.29% year-on-year, with net profit of $7.75 billion—a 95% surge that COSCO's annual report attributed directly to the Red Sea disruption. The incremental profit of approximately $3.88 billion above COSCO's 2023 baseline represents the quantifiable proceeds of Hobbs Act extortion. Those proceeds, as dollar-denominated international freight revenues, are cleared through the named banking Defendants' New York branches—confirmed by ICBC's own Resolution Plan's admission that ICBC NYBR serves as "the U.S. dollar clearing center primarily for ICBC and its subsidiary institutions outside the United States"—and thereby laundered through U.S. commercial banking operations in violation of 18 U.S.C. § 1956. China's four largest state-owned commercial banks—which are the banking Defendants herein—reported approximately $300 billion in dollar-denominated securities holdings as financial investments in 2023, as confirmed by Carnegie Endowment research based on the banks' public reporting. These dollar-denominated securities represent accumulated returns of U.S. commercial banking operations, including the dollar-clearing of both Iranian oil revenues and COSCO's extortion-derived freight revenues, and constitute United States assets directly attachable under 28 U.S.C. § 1610(b) to satisfy any judgment obtained herein. The unified financial loop is: (1) Iranian oil sold to Sinopec at a 12-18% guaranteed discount; (2)

revenues processed through Chuxin/Sinosure conduit backed by CIC; (3) dollar-cleared through banking defendants' New York branches; (4) COSCO earns elevated freight revenues from diverted commerce; (5) those revenues dollar-cleared through the same New York branches; (6) both revenue streams accumulate in the banking defendants' $300 billion U.S. dollar securities portfolio and flow upward through Central Huijin to CIC to the State Council as dividends. Each step in this loop that involves a U.S. commercial banking operation is a predicate money laundering act under 18 U.S.C. § 1956, independently supporting RICO liability and establishing the domestic nexus for both FSIA clause 1 jurisdiction and the Hobbs Act commerce element.

96.      To evade United States sanctions, Iran's oil is transported by "shadow fleets" of aging tankers that disable transponders, conduct ship-to-ship transfers in international waters, and relabel Iranian oil as originating from Malaysia, Oman, or the UAE. These cargoes are processed by independent "teapot" refineries in Shandong Province using renminbi-denominated payments through provincial banks and conduit entities. Sinosure, operating under PRC direction, provides credit guarantees backing the Chuxin payment conduit, through which an estimated $8.4 billion in sanctioned Iranian oil payments flowed in 2024. The named Chinese banking Defendants provide the dollar-clearing and correspondent banking services through their U.S. branches that are the upstream mechanism enabling this network to interface with the global financial system.

97.      Iran uses a network of financial institutions to launder the renminbi proceeds from its oil sales. Key nodes include financial arms of Iranian oil companies, Iranian money exchanges, and front companies affiliated with Iran's Ministry of Defense and Armed Forces Logistics (MODAFL), many of which maintain accounts at Chinese financial institutions. These accounts are used in part to finance the IRGC, Hezbollah, Hamas, Palestinian Islamic Jihad, and

59

the Houthis. The U.S.–China Economic and Security Review Commission confirmed in 2026 that Chinese banks, front companies, and intermediary firms facilitate these oil transactions, the shadow fleet operations, and the money laundering that enables it all.

98.     The United States Treasury has issued a continuous and escalating series of sanctions actions targeting this network, each placing the named banking Defendants on notice: February 2025 sanctions on the IRGC-linked Sepehr Energy Jahan group, controlling shipping fronts and consignees in China and Hong Kong; April–May 2025 designation of Chinese "teapot" refineries for purchasing Iranian crude; July 2025 sanctions targeting Iranian oil trade networks; October 2025 sweeping sanctions on Iran's energy exports; and February 6, 2026 shadow fleet sanctions immediately preceding Operation Epic Fury. Each of these designations constituted explicit notice to the named banking Defendants that the transactions they were facilitating were identified by the United States Government as terrorist financing.

99.     The United States Department of Commerce has placed fifteen Chinese companies on its Entity List for supplying U.S.-origin electronic components—including gyroscopes, sensors, and actuators—to Iranian proxy networks, explicitly including the Houthis. These designations, made pursuant to 15 C.F.R. Part 744, constitute formal U.S. government findings that identified Chinese commercial entities knowingly supplied weapons-enabling components to the same Houthi organization that attacked the MV Rubymar, placing the broader Chinese commercial ecosystem on constructive notice of the enterprise's use of Chinese-sourced components in its anti-ship weapons program.

100.     On September 11, 2025, the U.S. Treasury sanctioned Houthi-associated companies and operatives located in Yemen, China, the UAE, and the Marshall Islands, identifying Chinese firms including Hubei Chica Industrial Co., Ltd. (chemical precursors for

ballistic missiles), Shenzhen Shengnan Trading Co., Ltd. (dual-use electronic components for UAVs), and Shanxi Shutong Import and Export Trade Co. Ltd. (chemical precursors for missile motors). These entities operate within the PRC's state-directed supply chain for weapons technology and reflect the PRC's systematic provisioning of Iran's weapons programs through its commercial and industrial networks. The same Treasury action identified Yiwu Wan Shun Trading Company Limited, a China-based Houthi front company that has since at least 2021 coordinated large-scale procurement and shipment of UAV components and other dual-use items from Chinese suppliers critical to Houthi weapons manufacturing. Treasury further confirmed that representatives of Hubei Chica assisted the Houthis in falsifying shipping documents to circumvent China's export controls, and that Shenzhen Shengnan supported Houthi smuggling by mislabeling shipments containing UAV and dual-use items. Earlier, on June 17, 2024, Treasury designated Guangzhou Tasneem Trading Company Limited, a PRC-based Houthi-affiliated entity used to procure and ship weapons-manufacturing materials to Yemen. Treasury also confirmed that the Oman-based firm International Smart Digital Interface Limited Liability Company ("ISDI") had purchased and transferred cruise missile components from a PRC-based supplier, directly enabling a 2020 Houthi strike on a Saudi Aramco facility using a Quds-type land attack cruise missile containing PRC-sourced components—establishing a documented chain from Chinese supplier through third-country intermediary to specific Houthi attack.

### E.  CIC as the Financial Apex of the Enterprise

101.    CIC, as the ultimate beneficial owner of the enterprise through Central Huijin's controlling equity interests in each banking Defendant, sits at the financial apex of the conspiracy. The profits generated by the banking Defendants' commercial operations—including the proceeds of transactions facilitating Iranian oil revenues—flow upward through the corporate

61

structure and ultimately accrue to CIC. CIC's $1.33 trillion in assets under management, including substantial U.S. Treasury securities and dollar-denominated instruments acquired through commercial investment activity in the United States, represent in part the accumulated returns of the enterprise. CIC's U.S.-based assets, acquired through commercial activity in the United States, are subject to execution under the FSIA commercial activity exception as assets of an agency or instrumentality of a foreign state that has engaged in commercial activity in the United States. CIC's corporate architecture also satisfies the first Bancec prong—that the instrumentality was established to shield the sovereign from liability. CIC was capitalized in 2007 by the Ministry of Finance issuing special treasury bonds and using the proceeds to purchase foreign exchange reserves from the People's Bank of China, then transferring Central Huijin into CIC as a subsidiary. This created two layers of corporate separation between the State Council and the banking Defendants: State Council → Ministry of Finance → CIC → Central Huijin → banking defendants. The layered structure was designed to allow the Chinese state to maintain functional control over the banking system while interposing corporate entities that appear to be separate juridical persons under the Bancec framework. The U.S.-China Economic and Security Review Commission and the Federal Reserve's own supervision of the named banking Defendants' U.S. branches confirm that each bank operates as an instrument of PRC state policy. The deliberate engineering of this structure to provide sovereign cover for banking operations satisfies Bancec's prong 1. Prong 2 is satisfied by the PRC's continuous direction of each banking Defendant through Party committees, SASAC/Central Huijin board appointments, and mandatory compliance with the 2017 National Intelligence Law and Company Law. Prong 3 is satisfied by the documented acts of each banking Defendant in processing Iranian oil revenues, providing trade finance for shadow fleet crude purchases, and dollar-clearing sanctioned-party

transactions through their U.S. branches at the direction of the PRC's state policy implementing the 2021 China-Iran Comprehensive Strategic Partnership. The alter ego relationship between CIC and each banking Defendant is established by facts beyond ordinary majority ownership. Central Huijin holds controlling stakes in each banking Defendant: 34.71% of ICBC, 67.72% of Bank of China, 40.07% of Agricultural Bank of China, and 57.26% of China Construction Bank, as disclosed in those entities' public annual filings. CIC itself is wholly state-owned, with its board chairman and vice chairman appointed by and reporting directly to China's State Council pursuant to its founding charter. In 2009, the Ministry of Finance converted its ownership of CIC's debt into equity, relieving CIC of bond interest payments and instead requiring CIC to pay an annual dividend to the Ministry of Finance—a dividend that flows from the banking Defendants' commercial profits through Central Huijin to CIC and then to the State Council. The financial proceeds of the enterprise's Iranian oil revenue pipeline therefore flow directly to the Chinese government through CIC as the designated state conduit. CIC's most recently available SEC Form 13F disclosures confirm significant holdings of U.S. equity securities acquired through commercial activity in the United States and subject to execution under 28 U.S.C. § 1610(b). The combination of (a) CIC's direct State Council accountability, (b) its statutory dividend obligation funneling enterprise proceeds to the state, and (c) its continuous U.S. commercial investment activity satisfies both the Bancec alter ego standard and the FSIA commercial activity exception's nexus requirement.

102.    CIC's New York Representative Office at 277 Park Avenue is itself evidence of CIC's continuous commercial presence in the United States. CIC's New York office actively monitors and manages its U.S. investment portfolio—including its holdings in U.S. infrastructure, private equity, and debt markets—as part of CIC's commercial mandate to

maximize investment return on China's foreign exchange reserves. This continuous commercial activity in the United States satisfies the jurisdictional requirements of the FSIA commercial activity exception with respect to CIC.

103.    CIC's alter ego relationship with the PRC is most starkly demonstrated by its control over Sinosure—the state policy insurer that serves as the financial guarantor of the enterprise's Iranian oil payment pipeline. The shareholders of Sinosure are the Ministry of Finance and Central Huijin Investment Ltd., CIC's wholly owned subsidiary. In 2013, CIC injected RMB 20 billion into Sinosure directly via Central Huijin, as recorded in Sinosure's official corporate history. Sinosure underwrites the oil-for-infrastructure arrangement through which an estimated $8.4 billion in sanctioned Iranian oil payments flowed in 2024, as confirmed by the U.S.-China Economic and Security Review Commission's November 2025 report on China's facilitation of sanctions evasion. Under this arrangement, Chinese buyers of Iranian crude deposit payments with the Chuxin financial conduit, which then finances Chinese contractors building infrastructure in Iran, with Sinosure providing the credit guarantees that make the conduit operable. CIC's ownership of Sinosure through Central Huijin therefore makes CIC the ultimate guarantor of the financial mechanism through which $8.4 billion in Iranian oil revenues were processed in 2024 alone—the same revenue stream that funds the IRGC and its Houthi proxy. This is not passive investment: CIC directly capitalizes the institution that backstops Iran's primary sanctions evasion conduit.

104.    CIC's U.S. commercial presence is the final link in the money laundering chain that converts Iranian oil revenues into internationally usable assets. The laundering mechanism documented by the USCC and independent analysts operates in four stages: (1) Iranian crude oil is delivered to Chinese ports by shadow fleet tankers with falsified documentation, with cargoes

64

certified as Malaysian or Omani origin through inspection companies that have themselves been sanctioned by OFAC; (2) Chinese buyers pay in renminbi through provincial banks and conduit entities including Chuxin, which Sinosure (a CIC subsidiary through Central Huijin) underwrites; (3) the renminbi proceeds move from small provincial banks to larger Chinese financial institutions with Hong Kong subsidiaries, where they are converted and layered through front companies and intermediary accounts, as documented by the Economist in October 2024; and (4) the resulting dollar-denominated funds are cleared through the U.S.-regulated banking operations of the named banking Defendants' New York branches, converting the proceeds of Iranian oil sales into the global financial system. CIC's New York Representative Office, its SEC-registered U.S. equity holdings disclosed in Form 13F, and its U.S. Treasury security positions constitute the highest-level asset pool into which this laundered value ultimately flows and is held in the United States as commercially acquired assets—the collection target that the banking Defendants' U.S. dollar-clearing operations are designed to protect and preserve. Plaintiffs will seek execution against these assets under 28 U.S.C. § 1610(b) as assets of an agency or instrumentality of a foreign state that has engaged in commercial activity in the United States, and further contend that CIC's pervasive control over the enterprise—as owner of Central Huijin (which owns the banks), owner of Sinosure (which guarantees the conduit), and recipient of dividends from the enterprise's proceeds—satisfies the Bancec alter ego standard such that CIC's U.S. assets are directly reachable to satisfy judgments against the banking Defendants without piercing separate juridical status.

105.    CIC's liability as enterprise participant extends beyond its ownership of the banking defendants to encompass the entire enterprise, because CIC's banking subsidiaries provide the financial infrastructure that enables the industrial defendants' enterprise participation

65

to generate commercially usable value. Specifically: (a) Bank of China's New York Branch provides the trade finance and letters of credit that enable UNIPEC America to purchase Iranian-origin crude oil through shadow fleet cargoes, without which UNIPEC's Iranian crude program cannot interface with the global financial system; (b) ICBC's New York Branch and ICBC Financial Services LLC provide the dollar-clearing and U.S. Treasury securities operations that convert renminbi-denominated Iranian oil revenues into globally usable dollar-denominated assets; (c) Agricultural Bank of China's New York Branch processed dollar payments between Yemen and China as identified in its 2016 DFS Consent Order, providing the banking conduit through which Houthi network proceeds transit the U.S. financial system; and (d) China Construction Bank's New York Branch finances CCCG's infrastructure operations at the Doraleh Multipurpose Port, the physical logistics hub for weapons transshipment to Houthi forces. Each of these specific U.S. commercial banking acts—performed through federally licensed New York branches of entities owned through CIC's Central Huijin subsidiary—is a predicate act of the enterprise in which COSCO and Sinopec also participate. CIC therefore participates in the conduct of the enterprise's affairs with respect to all named Chinese defendants, not merely the banking defendants, and CIC's U.S.-based assets are reachable under 28 U.S.C. § 1610(b) to satisfy any judgment against any Chinese Defendant. The unified State Council direction of CIC—through its board appointment authority and dividend mandate—SASAC—through its ownership of Sinopec Group and China COSCO Shipping Corporation Limited—and the CCP Organization Department—through its appointment of top management across both channels—operating as a single principal with complementary financial and industrial instruments, satisfies the Bancec alter ego standard across the entire enterprise. As the financial apex whose subsidiaries enable the enterprise's commercial operations, and as the

recipient of enterprise monetary proceeds through dividends and portfolio appreciation, CIC is the alter ego of the PRC's direction of this conspiracy, with U.S. assets constituting the proper object of execution for all judgments obtained herein.

### F.  Russian Support to the Conspiracy

106. The Wall Street Journal reported in October 2024—citing a person familiar with the matter and two European defense officials—that Russia provided satellite targeting data to the Houthis to guide missiles and drones in attacks on commercial ships in the Red Sea, transmitted through IRGC members stationed in Yemen.

107. Russia launched the Khayyam satellite on behalf of Iran in August 2022, providing significantly more capable intelligence, surveillance, and reconnaissance capabilities than Iran's indigenously produced satellites. The Khayyam satellite's imagery has been used to support targeting of international shipping in the Red Sea.

108. On April 2, 2025, the U.S. Treasury identified a Houthi procurement network run by IRGC-Quds Force facilitator Sa'id al-Jamal that had "procured tens of millions of dollars' worth of commodities from Russia, including weapons and sensitive goods, as well as stolen Ukrainian grain, for onward shipment to Houthi-controlled Yemen." On March 5, 2025, Treasury sanctioned seven high-ranking Houthis who "smuggled military-grade items and weapon systems into Houthi-controlled areas of Yemen and also negotiated Houthi weapons procurements from Russia," and confirmed that senior Houthi officials had "communicated with officials from Russia and the People's Republic of China to ensure that Houthi militants do not strike Russian or PRC vessels transiting the Red Sea."

109. The depth of the Russian-Houthi relationship is further demonstrated by the specific acts detailed in U.S. Treasury designations. Treasury's April 2, 2025 designation

confirmed that Russia-based Afghan businessmen Hushang Ghairat and Sohrab Ghairat, acting at Sa'id al-Jamal's direction, orchestrated at least two shipments of stolen Ukrainian grain from Russian-occupied Crimea to Yemen aboard the Russia-flagged vessel AM THESEUS (also known as the ZAFAR), which was captained by Russian nationals for a significant portion of 2024. Treasury further confirmed that these individuals used financial facilitators to conduct transactions in support of the Houthis' trade ventures involving Russia. Separately, on June 20, 2025, Treasury designated Royal Plus Shipping Services and Commercial Agencies, a Sana'a-based front company that managed financial transfers between the Houthis, Russia, and Iran for the purchase and acquisition of weapons and other military equipment, including UAV engines. Treasury also designated Black Diamond Petroleum Derivatives, a Sana'a-based company that demonstrated an ability to import tens of thousands of tons of oil every month during negotiations with representatives from the Russian government over future oil deals between the Houthis and Moscow.

110.    Treasury's March 5, 2025 designations identified specific senior Houthi officials who traveled to Moscow and engaged directly with Russian government counterparts, including: Mohammad Abdulsalam, the Houthis' Oman-based spokesman, who traveled to Moscow to meet with Russian Ministry of Foreign Affairs personnel and coordinated with Russian military personnel to arrange additional Houthi delegations to Russia; Mahdi Mohammed Hussein Al-Mashat, Chairman of the Houthi-aligned Supreme Political Council, who worked to increase cooperation between the Houthis and the Government of Russia, including with Russian President Vladimir Putin; Mohamed Ali Al-Houthi, who communicated with Russian officials to guarantee safe passage for Russian vessels and planned travel to Russia with other Houthi military and intelligence operatives to discuss Russian aid; Ali Muhammad Muhsin Salih Al-

68

Hadi, head of the Houthi-aligned Sanaa Chamber of Commerce, who traveled to Russia to secure defense equipment for Houthi militants; Abdulmalek Abdullah Mohammed E Alagri, a senior Houthi operative who traveled as a member of prominent Houthi political and military delegations to Moscow and met with high-ranking Russian officials; and Khaled Hussein Saleh Gaber, a Houthi operative who participated in meetings with Russian Ministry of Foreign Affairs officials. Treasury also confirmed that Houthi-affiliated operatives ran a human smuggling operation recruiting Yemeni civilians to fight for Russia in Ukraine, generating revenue to support the Houthis' militant operations through Al-Jabri General Trading and Investment Co.

111. Reuters reported in September 2024 that Iran was brokering a deal between Russia and the Houthis to transfer P-800 Onyx (Yakhont) supersonic anti-ship cruise missiles. Rosoboronexport, as the Russian Federation's sole authorized state intermediary for all defense product exports under Russian law, is the entity through which any such transfer would necessarily have been authorized or facilitated under Russian law.

## CAUSES OF ACTION

### COUNT I

**Violation of the Racketeer Influenced and Corrupt Organizations Act**

**18 U.S.C. § 1964(c)**

(Against All Defendants)

112. Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

113. At all relevant times, Defendants operated as and constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4). The enterprise consisted of the Houthi organization,

the Islamic Republic of Iran, and the Chinese and Russian Defendants, forming an association in fact with the common purpose of restricting commercial shipping in the Red Sea through violence and extortion for their mutual economic benefit. The PRC, while not a named defendant, is the directing principal of this enterprise, acting through the named Chinese Defendants as its instruments and agents.

114.    The non-defendant conspiracy participants identified in Section II.F—including Sinosure, AVIC, CGSTL, and the sanctioned electronics and logistics entities—are enterprise members whose conduct constitutes predicate acts within the meaning of 18 U.S.C. § 1961. Their conduct establishes the enterprise's existence and scope, and demonstrates the named Defendants' knowing participation in an enterprise of which this conduct was a foreseeable and intended component. The PRC's direction of both the named Defendants and the non-defendant participants is evidence of the enterprise's coordinated character.

115.    The Chinese banking Defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c) by knowingly providing, through their U.S.-licensed branches and subsidiaries, the dollar-clearing, correspondent banking, and settlement services constituting the economic infrastructure of the enterprise's Iranian oil revenue pipeline. These U.S. commercial banking transactions constituted: (a) violations of the Hobbs Act, 18 U.S.C. § 1951, by facilitating the PRC-directed enterprise's extortion of maritime commerce over which the United States has jurisdiction; and (b) violations of federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957, by knowingly processing through U.S. banking operations funds derived from Iran's sanctioned oil sales with knowledge that the funds were proceeds of specified unlawful activity.

116.    CIC, as the ultimate beneficial owner of the enterprise through Central Huijin's controlling equity interests in each banking Defendant, conducted the enterprise's affairs through the banking Defendants' U.S. commercial operations and received the proceeds thereof. CIC's U.S.-based assets acquired through commercial activity in the United States are subject to execution under the FSIA commercial activity exception.

117.    The regular and routine cooperation between the Houthis and the other Defendants constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), consisting of at least two acts of racketeering activity within a ten-year period. In furtherance of this conspiracy, Houthi military forces attacked the MV Rubymar on February 18, 2024, causing it to sink on March 2, 2024, and committed numerous other acts of violence and extortion against commercial shipping as described herein.

118.    As a direct and proximate result of Defendants' RICO violations, Plaintiffs have been injured in their business and property. Plaintiffs are entitled to recover treble damages, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), jointly and severally against all Defendants.

## COUNT II

### RICO Conspiracy

### 18 U.S.C. § 1962(d)

(Against All Defendants)

119.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

120.    Each named Defendant knowingly agreed to facilitate an enterprise that would engage in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(4) and (5), in

71

violation of 18 U.S.C. § 1962(d). Under § 1962(d), a defendant need not conduct or participate in the operation of the enterprise under the operation-or-management test of Reves v. Ernst & Young, 507 U.S. 170 (1993); it is sufficient that the defendant agreed to facilitate the enterprise's pattern of racketeering. Each named Defendant entered into this agreement by: (a) knowingly providing the financial infrastructure, trade finance, chemical precursors, satellite access, or commercial shipping services that sustained the enterprise's operation, with knowledge that the enterprise would engage in Hobbs Act extortion, wire fraud, money laundering, and acts of maritime violence in furtherance of its purpose; and (b) accepting the commercial benefits of the enterprise's racketeering activity—discounted Iranian crude oil, safe passage through contested maritime chokepoints, and elevated freight revenues—with full knowledge of the means by which those benefits were obtained. The § 1962(d) conspiracy count independently sustains the claims against each Defendant regardless of the precise degree to which any individual defendant conducted or participated in the operation of the enterprise's affairs under the Reves standard, and provides an independent basis for liability against defendants whose primary role was facilitation rather than direction of the enterprise's affairs.

121.    As a direct and proximate result of Defendants' RICO conspiracy in violation of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property. Plaintiffs are entitled to recover treble damages, costs, and reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c), jointly and severally against all Chinese Defendants.

## COUNT III

**Violation of the Antiterrorism Act**

**18 U.S.C. § 2333**

(Against All Defendants)

122.     Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

123.     The Houthis have engaged in a series of actions constituting "international terrorism" as defined by 18 U.S.C. § 2331(1), including the intentional targeting and sinking of the MV Rubymar. These actions are violent acts that constitute piracy under customary international law and would constitute criminal violations under United States law. The Houthis engage in these activities to coerce civilian populations and to extort funds from entities seeking to transit the Red Sea.

124.     Iran is primarily liable under 18 U.S.C. § 2333(a) as the state sponsor that directly provided the weapons, financing, and material support enabling the Houthi attack on the MV Rubymar. The Chinese Defendants are secondarily liable under 18 U.S.C. § 2333(d) (as added by JASTA) for aiding and abetting international terrorism by providing substantial assistance to Iran's terrorism-sponsoring activities through their U.S. commercial banking operations. The U.S.-based commercial banking activity of the Chinese Defendants satisfies the domestic nexus required for ATA claims against foreign sovereign instrumentalities.

125.     The Chinese banking Defendants' aiding-and-abetting liability under § 2333(d) is established by: (a) their general awareness, through continuous OFAC designations of Iranian oil trade participants and USCC published findings, of their role in the broader enterprise funding international terrorism; (b) the substantial assistance they knowingly provided through U.S.

73

commercial banking operations processing funds from Iran's sanctioned oil sales; and (c) the United States Government's own determination in Operation Epic Fury that Iran's IRGC-funded proxy network—sustained in substantial part by the Chinese banking Defendants' U.S. commercial operations—constituted a terrorist threat warranting military force.

126.    Sovcomflot and Rosoboronexport are secondarily liable under 18 U.S.C. § 2333(d) for aiding and abetting international terrorism by providing material support to the Houthis in the form of targeting intelligence, military personnel, weapons negotiations, and diplomatic cover.

127.    As a direct and proximate result of Defendants' violations, Dr. Chahadeh, a United States national, was injured in his property and business. Dr. Chahadeh is entitled to recover treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 2333(a), jointly and severally against all Defendants.

## COUNT IV

### Tortious Interference with Contract

(Against All Defendants)

128.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

129.    At the time of the attack, Golden Adventure had a valid and enforceable contract for the carriage of cargo from the United Arab Emirates to Bulgaria aboard the MV Rubymar. Defendants knew or should have known that the MV Rubymar was a commercial cargo vessel engaged in maritime commerce for hire. By causing the sinking of the MV Rubymar, Defendants intentionally and unjustifiably interfered with Golden Adventure's contractual performance. As a

direct and proximate result, Plaintiffs suffered damages including the loss of contract revenue and other consequential damages in an amount to be proven at trial.

## COUNT V

### Tortious Interference with Business Expectancy

(Against All Defendants)

130.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully set forth herein.

131.    Golden Adventure had a reasonable expectation of continued maritime commerce through the useful life of the MV Rubymar. By causing the sinking of the MV Rubymar, Defendants intentionally and unjustifiably interfered with Golden Adventure's future maritime commerce. As a direct and proximate result, Plaintiffs suffered damages including the loss of future revenue through the MV Rubymar's remaining useful life, in an amount to be proven at trial.

## JURY DEMAND

132.    Pursuant to Federal Rule of Civil Procedure 38(b) and LCvR 38.1, Plaintiffs hereby demand a trial by jury of all issues so triable that are raised herein or which may hereinafter be raised in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that judgment be entered in their favor and against Defendants as follows:

A.  For Counts I and II (RICO), Plaintiffs be awarded treble damages pursuant to 18 U.S.C. § 1964(c), jointly and severally against all Defendants, for the total loss of the MV Rubymar (fair market value $5 million to $6 million; total value to owner $6.1 million to $9.3

million), its cargo (approximately $10.5 million to $12.5 million), lost business income, environmental remediation costs (estimated at $15 million to $100 million), navigational hazard remediation, and all other consequential damages believed to total between $30 million and $105 million before trebling, plus attorney's fees and costs;

B.  For Count III (ATA), Dr. Hassan Chahadeh be awarded treble damages pursuant to 18 U.S.C. § 2333(a), jointly and severally against all Defendants, plus attorney's fees and costs;

C.  For Count IV (Tortious Interference with Contract), Plaintiffs be awarded compensatory damages for the loss of contract revenue, jointly and severally against all Defendants;

D.  For Count V (Tortious Interference with Business Expectancy), Plaintiffs be awarded compensatory damages for the loss of future revenue through the MV Rubymar's remaining useful life, jointly and severally against all Defendants;

E.  This Court enter a prejudgment order pursuant to applicable law preserving and restraining the disposition of the U.S. commercial branch assets of the Chinese banking Defendants, the U.S. investment assets of CIC held through commercial activity in the United States, and the OFAC-blocked assets of Sovcomflot and Rosoboronexport, pending final judgment;

F.  Plaintiffs be awarded pre-judgment and post-judgment interest;

G.  Plaintiffs be awarded punitive damages to the extent permitted by law; and

H.  The Court award such other and further relief as is just, equitable, and proper, including prejudgment attachment of Defendants' assets located within the United States pursuant to Rule 64 of the Federal Rules of Civil Procedure and applicable state law, to preserve

those assets pending final judgment and to prevent dissipation or transfer that would frustrate the

enforcement of any judgment entered herein.

Respectfully submitted,

GOLDEN ADVENTURE SHIPPING CORP.

and DR. HASSAN CHAHADEH

By: ***John Reed Thomas, Jr.***

John R. Thomas, Jr.

Counsel for Plaintiffs

John R. Thomas, Jr. (D.C. Bar No. 1027981)
John Hafemann (GA Bar No. 327982)
M. Brian Magee (GA Bar No. 566350)
**HAFEMANN MAGEE & THOMAS, LLC**
1000 Towne Center Boulevard
Suite 804
Pooler, GA 31322
(540) 759-1660
jt@fed-lit.com

*Counsel for Plaintiffs*