**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GOLDEN ADVENTURE SHIPPING CORP.
and HASSAN CHAHADEH,

    *Plaintiffs*,

    v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

    *Defendants*.

Case No. 1:26-cv-01103-SLS

ORAL ARGUMENT REQUESTED

**COSCO SHIPPING (NORTH AMERICA) INC.'S**
**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF ITS**
<u>**MOTION TO DISMISS ALL CLAIMS AGAINST IT**</u>

**WHITE & CASE**
701 Thirteenth Street, NW
Washington, DC 20005

July 14, 2026

*Counsel for COSCO SHIPPING (North America) Inc.*

**TABLE OF CONTENTS**

ALLEGATIONS OF THE COMPLAINT.................................................................................................1

ARGUMENT .........................................................................................................................................3

I.    THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE THIS COURT'S
      SUBJECT-MATTER JURISDICTION OVER COSCO NA UNDER THE FSIA'S
      COMMERCIAL-ACTIVITY EXCEPTION TO SOVEREIGN IMMUNITY ...................4

      A.    The Gravamen of the Claims Is the Sinking of the MV Rubymar, Not Any
            Commercial Activity by COSCO NA........................................................................6

      B.    The Claims Are Not Based Upon Commercial Activity Imputable to
            COSCO NA that Caused a "Direct Effect in the United States" ............................9

            1.    The PRC's Purported Orchestration of the "Safe Passage
                  Arrangement" Cannot Be Imputed to COSCO NA ...................................10

            2.    The PRC's Purported Orchestration of the "Safe Passage
                  Arrangement" Is Not Commercial Activity...............................................13

            3.    The PRC's Purported Orchestration of the "Safe Passage
                  Arrangement" Did Not Cause a Direct Effect in the United States..........14

II.   THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE ANY BASIS FOR THIS
      COURT'S EXERCISE OF PERSONAL JURISDICTION OVER COSCO NA .............16

III.  THE COMPLAINT FAILS TO STATE A CLAIM AGAINST COSCO NA .................17

      A.    The Complaint Fails to State a Claim Due to Conclusory Group Pleading ..........18

      B.    The Complaint Fails to State a RICO Claim of Racketeering or
            Conspiracy .............................................................................................................20

            1.    The Complaint Fails to Allege a Domestic Injury ....................................20

            2.    The Complaint Fails to State a Racketeering Claim Under
                  § 1962(c) ..................................................................................................23

            3.    The Complaint Fails to State a Conspiracy Claim Under § 1962(d) ........25

      C.    The Complaint Fails to State an ATA Claim for Aiding and Abetting .................26

            1.    Section 2337(2) Bars the Complaint's ATA Claim Against
                  COSCO NA ..............................................................................................26

            2.    The Complaint Does Not Seek Recovery for an Injury to a
                  "National of the United States"..................................................................27

3.      The Complaint Fails to Allege That the Houthis Were Designated Under U.S. Law as a Foreign Terrorist Organization ................................28

4.      The Complaint Fails to Allege That COSCO NA Knowingly Provided Substantial Assistance to the Attack on the MV Rubymar ........29

D.      The Complaint Fails to State a Claim for Tortious Interference ...........................32

CONCLUSION.............................................................................................................................34

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abernathy v. Carlyle Grp., Inc.*,
   No. 22-cv-3603, 2024 U.S. Dist. LEXIS 237526 (D.D.C. Sep. 27, 2024) ........................21–22

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ...............................................................................................................25

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ............................................................................................................4, 17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................... *passim*

*Bao Ge v. Li Peng*,
   201 F. Supp. 2d 14 (D.D.C. 2000) ...............................................................................9, 14, 16

*Bates v. Nw. Human Servs., Inc.*,
   466 F. Supp. 2d 69 (D.D.C. 2006) .........................................................................................18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................................15, 17–19

*Biton v. Palestinian Interim Self-Government Auth.*,
   310 F. Supp. 2d 172 (D.D.C. 2004) .......................................................................................28

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
   581 U.S. 170 (2017) ..............................................................................................................4–5

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
   447 F.3d 411 (5th Cir. 2006) .............................................................................................12–13

*Brown v. Carr*,
   503 A.2d 1241 (D.C. 1986) ....................................................................................................32

*Browning v. Clinton*,
   292 F.3d 235 (D.C. Cir. 2002) .................................................................................................5

*Cheeks v. Fort Myer Constr. Corp.*,
   71 F. Supp. 3d 163 (D.D.C. 2014) .....................................................................................18–19

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003) .................................................................................................................3

*E. Sav. Bank, FSB v. Papageorge*,
  31 F. Supp. 3d 1 (D.D.C. 2014) ..................................................................................23, 25

*Econ. Rsch. Servs., Inc. v. ADR Econ., LLC*,
  208 F. Supp. 3d 219 (D.D.C. 2016) ...................................................................................32

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
  104 F.4th 287 (D.C. Cir. 2024) ...........................................................................................9

*EM Ltd. v. Banco Cent. de la República Argentina*,
  800 F.3d 78 (2d Cir. 2015) .................................................................................................12

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*,
  529 F.3d 1087 (D.C. Cir. 2008) ........................................................................................16

* *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) (*"Bancec"*) ...................................................................7, 10, 12

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
  905 F.2d 438 (D.C. Cir. 1990) ......................................................................................11–12

*Gater Assets Ltd. v. Moldovagaz*,
  2 F.4th 42 (2d Cir. 2021) ...................................................................................................12

*Hafez v. Vidino*,
  No. 24-cv-00873, 2025 U.S. Dist. LEXIS 193423 (D.D.C. Sep. 30, 2025) ................21–23, 33

*Hemi Grp., LLC v. City of New York*,
  559 U.S. 1 (2010) ..........................................................................................................24–25

*Heping Li v. Keqiang Li*,
  No. 20-cv-2008, 2023 U.S. Dist. LEXIS 60329 (D.D.C. Apr. 5, 2023) ...............................5–6

*Jankovic v. Int'l Crisis Grp.*,
  593 F.3d 22 (D.C. Cir. 2010) .............................................................................................33

*Johnson v. Comm'n on Presidential Debates*,
  202 F. Supp. 3d 159 (D.D.C. 2016) ...................................................................................33

*Koudoukara v. Embassy of Mali*,
  No. 24-cv-1900, 2026 U.S. Dist. LEXIS 122792 (D.D.C. June 3, 2026) ..............................6

*Lawton v. Republic of Iraq*,
  581 F. Supp. 2d 43 (D.D.C. 2008) .................................................................................26–27

*Litle v. Arab Bank, PLC*,
  507 F. Supp. 2d 267 (E.D.N.Y. 2007) ................................................................................27

*La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*,
    533 F.3d 837 (D.C. Cir. 2008) ...................................................................................28

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ...................................................................................................22

*Mwani v. Osama Bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ......................................................................................13

*Nathan v. Whirlpool Corp.*,
    492 F. Supp. 3d 747 (S.D. Ohio 2020) .....................................................................32

* *OBB Personenverkehr AG v. Sachs*,
    577 U.S. 27 (2015) ...................................................................................................7–8

*Prac. Concepts, Inc. v. Republic of Bolivia*,
    811 F.2d 1543 (D.C. Cir. 1987) .................................................................................17

*Princz v. Federal Republic of Germany*,
    26 F.3d 1166 (D.C. Cir. 1994) ..................................................................................16

* *Pugh v. Socialist People's Libyan Arab Jamahiriya*,
    290 F. Supp. 2d 54, 56 (D.D.C. 2003) ......................................................................27

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) .........................................................................................9, 13, 15

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ...................................................................................................23

*RJR Nabisco, Inc. v. European Cmty.*,
    579 U.S. 325 (2016) ...................................................................................................20

* *Rodriguez v. Lab'y Corp. of Am. Holdings*,
    13 F. Supp. 3d 121 (D.D.C. 2014) .......................................................................33–34

*Romero v. Flowers Bakeries, LLC*,
    No. 14-cv-05189, 2016 U.S. Dist. LEXIS 15868 (N.D. Cal. Feb. 8, 2016) .............32

*RSM Production Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*,
    682 F.3d 1043 (D.C. Cir. 2012) ...........................................................................25–26

* *Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) .......................................................................................7–8, 13–14

*Schansman v. Sberbank of Russia PJSC*,
    128 F.4th 70 (2d Cir. 2025) .......................................................................................27

*Toumazou v. Turkish Republic of N. Cyprus*,
  71 F. Supp. 3d 7 (D.D.C. 2014) ..................................................................................18

*TransAmerica Leasing, Inc. v. La Republica de Venezuela*,
  200 F.3d 843 (D.C. Cir. 2000) ...............................................................................10–11

*Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*,
  204 F.3d 384 (2d Cir. 2000) ........................................................................................7

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ........................................................................................28–30, 32

*Uni-Top Asia Inv. Ltd. v. Sinopec Int'l Petro. Expl. & Prod. Corp.*,
  No. 20-cv-1770, 2022 U.S. Dist. LEXIS 14635 (D.D.C. Jan. 26, 2022) ................................12

* *Valambhia v. United Republic of Tanzania*,
  964 F.3d 1135 (D.C. Cir. 2020) ...................................................................5, 8, 9, 15

*Wultz v. Islamic Republic of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................16–17

*Yang Rong v. Liaoning Province Gov't*,
  452 F.3d 883 (D.C. Cir. 2006) ...................................................................................15

* *Yegiazaryan v. Smagin*,
  599 U.S. 533 (2023) ...............................................................................................20–23

*Yerkyn v. Yakovlevich*,
  164 F.4th 224 (2d Cir. 2026) .......................................................................................22

*Zedan v. Kingdom of Saudi Arabia*,
  849 F.2d 1511 (D.C. Cir. 1988) .................................................................................14

## STATUTES AND RULES

8 U.S.C. § 1101(a)(22) .....................................................................................................27

8 U.S.C. § 1189 ...............................................................................................................28

18 U.S.C. § 1343 .............................................................................................................23

18 U.S.C. § 1951 .............................................................................................................23

18 U.S.C. § 1956 .............................................................................................................23

18 U.S.C. § 1957 .............................................................................................................23

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968

    18 U.S.C. §§ 1961(1) ..................................................................................23

    18 U.S.C. §§ 1961(5) ..................................................................................23

    18 U.S.C. § 1962(c) ....................................................................................23

    18 U.S.C. § 1962(d) ....................................................................................25

    18 U.S.C. § 1964(c) .............................................................................20, 24

18 U.S.C. § 2280.....................................................................................................23

Anti-Terrorism Act, 18 U.S.C. §§ 2331–2339D

    18 U.S.C. § 2331(2) ....................................................................................27

    18 U.S.C. § 2333(a) ....................................................................................27

    18 U.S.C. § 2333(d) ....................................................................................27

    18 U.S.C. § 2333(d)(2) ...........................................................................28–29

    18 U.S.C. § 2337(2) ...............................................................................26–27

28 U.S.C. § 1332(c) ...................................................................................................4

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611

    28 U.S.C. § 1330(a) ...................................................................................4, 6

    28 U.S.C. § 1603(a) ......................................................................................4

    28 U.S.C § 1603(b)(3) ..................................................................................3

    28 U.S.C. § 1605(a)(2)..................................................................... *passim*

    28 U.S.C. § 1608(b) ....................................................................................17

Fed. R. Civ. P. 8....................................................................................................18–19

Fed. R. Civ. P. 12(b)(1)...............................................................................................1

Fed. R. Civ. P. 12(b)(2)...........................................................................................1, 16

Fed. R. Civ. P. 12(b)(6)......................................................................................1, 5, 17–18

## OTHER AUTHORITIES

Exec. Order No. 14175, 90 Fed. Reg. 8639 (Jan. 22, 2025)..........................................................29

\* *Indicates authority on which counsel chiefly relies.*

The Complaint in this action (ECF 1) alleges a sweeping conspiracy, among a host of alleged conspirators, leading to the sinking of a commercial maritime vessel in the Red Sea in 2024.  One of the alleged conspirators is COSCO SHIPPING (North America) Inc. ("COSCO NA").  For the reasons discussed below, every claim against COSCO NA must be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction, under Rule 12(b)(2) for lack of personal jurisdiction, and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

## ALLEGATIONS OF THE COMPLAINT

The Complaint alleges that Plaintiff Golden Adventure Shipping Corporation ("Golden Adventure") is a Wyoming corporation (Compl. ¶¶ 3, 21) with its principal place of business in Wyoming (*id.* ¶ 21).  The Complaint alleges that Golden Adventure is the "legal successor in interest of Golden Adventure Shipping, S.A., a Marshall Islands corporation."  *Id.* ¶ 21; *see id.* ¶ 2.  The Complaint alleges that Plaintiff Dr. Hassan Chahadeh is a U.S. citizen and an anesthesiologist residing in Texas and the sole shareholder of Golden Adventure.  *Id.* ¶¶ 3, 22.

According to the Complaint, on February 18, 2024, a commercial maritime vessel named the MV Rubymar was transiting through international waters in the Strait of Bab el-Mandeb in the Red Sea, carrying cargo of fertilizer, when Houthi rebels fired an anti-ship ballistic missile at the MV Rubymar, causing catastrophic hull damage.  *Id.* ¶ 4.  About two weeks later, on March 2, 2024, the MV Rubymar sank, resulting in the total loss of the ship and its cargo.  *Id.* ¶¶ 4, 9.

At the time of the attack (and the loss), the MV Rubymar was owned and operated by Golden Adventure Shipping, S.A., the Marshall Islands corporation.  *Id.* ¶ 2.

The Complaint alleges that the sinking of the MV Rubymar was the result of an elaborate conspiracy among numerous alleged conspirators including the People's Republic of China

("PRC"), the Islamic Republic of Iran (apparently including its Islamic Revolutionary Guard Corps ("IRGC")), and various entities alleged to be affiliated with the PRC, as well as two other entities alleged to be affiliated with the Russian Federation. Compl. ¶¶ 5, 13–18, 23–62. The Complaint summarizes the alleged conspiracy as follows:

> Acting through its state-owned enterprises, state-owned banks, and state investment fund, the PRC has orchestrated a systematic arrangement with Iran and the Houthis within which: Iranian crude oil is purchased at a discount by Chinese state-controlled entities; the revenues from those purchases flow through Chinese financial institutions and fund the IRGC and its Houthi proxy; the Houthis attack non-Chinese commercial shipping, suppressing competition and raising freight rates for the benefit of Chinese carriers; and Chinese-flagged vessels transit the Red Sea under a formal safe passage agreement extracted from the Houthis as the price of China's continued financial support.

*Id.* ¶ 5.

The Complaint alleges that COSCO NA is one of the PRC-affiliated conspirators in the alleged conspiracy, and each of the five counts in the Complaint is against COSCO NA (as well as against every other named Defendant). *Id.* ¶¶ 1, 13, 50, 112–32. The Complaint identifies COSCO NA as among the named "Chinese Defendants" and further alleges that "alter ego and agency theories" are "relevant to each Chinese Defendant's liability." *Id.* ¶ 5. The Complaint alleges that COSCO NA, like the other Chinese Defendants, "operates as an instrumentality, agent, and alter ego of the PRC and the Chinese Communist Party ("CCP")." *Id.* ¶ 25. As the "exclusive" basis for jurisdiction over COSCO NA and the other "Chinese Defendants," the Complaint expressly invokes the Foreign Sovereign Immunities Act ("FSIA"): "This Court has jurisdiction over each Chinese Defendant" — expressly including COSCO NA — "exclusively pursuant to the commercial activity exception to the FSIA." *Id.* ¶ 13; *see also id.* ¶ 75 ("Jurisdiction over all Chinese Defendants . . . rests exclusively on the commercial activity exception . . . .").

The Complaint alleges that COSCO NA is "the regional management subsidiary" of China COSCO Shipping Corporation Limited ("COSCO") (*id.* ¶ 50), which the Complaint alleges "is a majority state owned multinational shipping and logistics conglomerate headquartered in Shanghai, China, and an agency or instrumentality of the PRC" within the meaning of the FSIA (*id.* ¶ 47).  The Complaint alleges that COSCO NA is headquartered in Secaucus, New Jersey. *Id.* ¶ 50.

The Complaint is conspicuously devoid of any allegations of how COSCO NA joined or participated in the alleged conspiracy.  The Complaint's allegations that COSCO NA should be considered an alter ego, agent, and instrumentality of the PRC are conclusory.  Nonetheless, the Complaint alleges subject-matter and personal jurisdiction exclusively under the FSIA's commercial-activity exception and asserts claims against COSCO NA based on the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts I and II), the Antiterrorism Act ("ATA") (Count III), and Tortious Interference with Contract and Business Expectancy (Counts IV and V).

## **ARGUMENT**

COSCO NA categorically rejects the substantive allegations of the Complaint, but nonetheless accepts them as true solely for purposes of this Motion to Dismiss.  In particular, but without limitation, COSCO NA rejects that it is an "agency or instrumentality" of the PRC within the meaning of the FSIA.  Indeed, COSCO NA considers such a characterization to be foreclosed by (i) *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003), in which the Supreme Court held that a corporation cannot qualify as an "agency or instrumentality" unless a majority of its shares is owned directly by a foreign state, and (ii) 28 U.S.C § 1603(b)(3) in which the FSIA provides that a corporation cannot qualify as an "agency or instrumentality" of a foreign state if it is a citizen of

–3–

a U.S. State as defined in 28 U.S.C. § 1332(c) (providing that a corporation is a citizen of every State by which it has been incorporated or in which it has its principal place of business).  In any event, because the Complaint alleges that COSCO NA is an agency or instrumentality of the PRC and that the FSIA supplies the "exclusive" basis for subject-matter and personal jurisdiction, COSCO NA addresses why the FSIA does not provide jurisdiction in this Court before addressing why the Complaint's five counts against COSCO NA fail to state a claim upon which relief may be granted.

I.    **THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE THIS COURT'S SUBJECT-MATTER JURISDICTION OVER COSCO NA UNDER THE FSIA'S COMMERCIAL-ACTIVITY EXCEPTION TO SOVEREIGN IMMUNITY**

Upon taking effect in 1977, the FSIA became "the sole basis for obtaining jurisdiction over a foreign state" in the courts of the United States.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also* 28 U.S.C. § 1330(a).  The FSIA generally defines "foreign state" to include an "agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a). A foreign state and its agencies and instrumentalities are presumptively immune from the jurisdiction of United States courts unless a plaintiff can "show (and not just arguably show)" that an exception to immunity applies.  *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 187 (2017).

Characterizing COSCO NA, and all of the Chinese Defendants, as "agencies or instrumentalities" of the PRC (Compl. ¶ 79; *see also id.* ¶ 25), the Complaint invokes this Court's subject-matter jurisdiction "exclusively pursuant to the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2)."  *Id.* ¶ 13; *see also id.* ¶ 75 ("Jurisdiction over all Chinese Defendants and all Russian Defendants rests exclusively on the commercial activity exception, 28 U.S.C. § 1605(a)(2).").  Nevertheless, the Complaint fails to sufficiently allege a basis to satisfy the

–4–

commercial-activity exception — or any other exception — to sovereign immunity, and thus the claims against COSCO NA should be dismissed for lack of subject-matter jurisdiction.

The "commercial activity" exception permits a court to exercise jurisdiction over a foreign state only where the plaintiff's action is "based upon" one of three narrowly defined types of conduct: 1) "a commercial activity carried on in the United States by the foreign state;" 2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;" or 3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The Complaint alleges that the commercial-activity exception applies in this action only under the first and third clauses. *See* Compl. ¶ 92 ("This action does not rely on the second clause of § 1605(a)(2) for any Chinese Defendant.").

Where, as here, a defendant challenges only the legal sufficiency of a complaint's jurisdictional allegations, the pleading standard "is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020) (citation omitted) (affirming dismissal of amended complaint for lack of subject-matter jurisdiction under the commercial-activity exception); *see also Helmerich*, 581 U.S. at 187 (holding that merely "making a nonfrivolous argument [that an exception to immunity applies] is not sufficient"). The Court, therefore, may not accept "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint, nor legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *see also Heping Li v. Keqiang Li*, No. 20-cv-2008, 2023 U.S. Dist. LEXIS 60329, at *23 (D.D.C. Apr.

5, 2023) ("[T]he Court may not credit Plaintiffs' unsupported legal conclusions, even if they are offered in the guise of factual statements.").

The "commercial activity" exception does not apply here, because the claims in the Complaint are not "based upon" alleged commercial activity by COSCO NA, in the United States or elsewhere, regardless of any supposed involvement of COSCO NA in the alleged "safe passage arrangement" purportedly orchestrated by the PRC.  The Complaint fails to allege any commercial conduct by COSCO NA forming the basis of the claims.  And no alleged commercial activity by the PRC or other purported conspirators can be relevant to the claims against COSCO NA, because the Complaint fails to allege that any of the other purported conspirators is the alter ego of COSCO NA.  Furthermore, regardless of corporate separateness, the Complaint also fails to allege that any extraterritorial commercial activity upon which its claims are based — whether activity by the PRC or COSCO NA — had a "direct effect" in the United States.

Beyond the inapplicability of the commercial-activity exception, the Complaint's demand for a jury trial (Compl. ¶ 132) must be stricken.  *See* 28 U.S.C. § 1330(a) (providing that "district courts shall have original jurisdiction without regard to amount in controversy of any *nonjury* civil action against a foreign state" (emphasis added)); *Koudoukara v. Embassy of Mali*, No. 24-cv-1900, 2026 U.S. Dist. LEXIS 122792, at *7 (D.D.C. June 3, 2026) (Sooknanan, J.) (striking plaintiff's jury demand and observing that "all federal appellate courts which have considered the issue have held that jury trials are not available in suits brought under the FSIA").

### A.    The Gravamen of the Claims Is the Sinking of the MV Rubymar, Not Any Commercial Activity by COSCO NA

As already shown, to satisfy the FSIA's commercial-activity exception (§ 1605(a)(2)), Plaintiffs' action must be "based upon" the alleged commercial activity.  The Supreme Court has held that the "based upon" requirement focuses on "those elements of a claim that, if proven, would

–6–

entitle a plaintiff to relief under his theory of the case" — that is, the "gravamen" of the suit. *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). The required connection between the alleged conduct and Plaintiffs' harm is even closer than "proximate cause" under common law. *See Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 390 (2d Cir. 2000) ("We know from *Nelson* that 'based upon' requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is *considerably greater than common law causation* requirements." (emphasis added) (citing *Nelson*, 507 U.S. at 358 (holding that the "based upon" requirement "calls for something more than a mere connection with, or relation to, commercial activity"))). Courts must, therefore, "identify the particular conduct on which the plaintiff's action is based" by looking past the complaint's characterizations and "zero[ing] in" on the conduct that "*actually injured*" the plaintiffs. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33, 35 (2015) (cleaned up, emphasis added). This application of the "gravamen test" is essential to prevent plaintiffs from "evad[ing] the [FSIA's] restrictions through artful pleading." *Id.* at 36.

Here, the claims in the Complaint are "based upon" the sinking of the MV Rubymar in the Red Sea — i.e., the event that "actually injured" Plaintiffs, and an event far attenuated from any alleged conduct by COSCO NA either in or having a direct effect upon the United States. Although COSCO NA is alleged to be a U.S.-based commercial enterprise (Compl. ¶ 50), the Complaint's claims are not "based upon" any of COSCO NA's own commercial activity.

The Complaint alleges, in extremely cursory fashion, certain commercial activity conducted only by COSCO NA's "approximately twenty subsidiaries and joint ventures," not by COSCO NA *itself*, in the United States or otherwise. Compl. ¶¶ 50, 91–92. Even supposing that any *subsidiaries* of COSCO NA took some shipping-related action in or directly affecting the

United States, these distinct entities cannot be equated with COSCO NA.  *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983) (*"Bancec"*) (holding that "distinct and independent" juridical entities "should normally be treated as such" under the FSIA).  Furthermore, COSCO NA's subsidiaries are alleged to be located in "the United States, *Canada, Panama, and Mexico*."  Compl. ¶ 50 (emphasis added).  The Complaint's ambiguous allegation of where COSCO NA's subsidiaries' purportedly engaged in pertinent commercial activity cannot support a "plausible inference[]" sufficient to satisfy the requirement under the first clause of § 1605(a)(2) for commercial activity in the United States.  *Valambhia*, 964 F.3d at 1139.  And the Complaint makes no allegation regarding the subsidiaries' purported conduct that would satisfy the third clause of § 1605(a)(2) (foreign conduct with "direct effect in the United States").  Above all, nothing about COSCO NA's purported conduct (or that of its subsidiaries) — whether in the United States or elsewhere — can be properly characterized as having "actually injured" Plaintiffs.

The Complaint further attempts to connect alleged COSCO NA conduct to the sinking of the MV Rubymar by alleging a global "conspiracy" through which the Defendants purportedly committed various intentional torts.  This is no more than "artful pleading" intended to circumvent the FSIA's narrow commercial-activity exception.  *Sachs*, 577 U.S. at 36; *see also id.* ("To allow such recasting of a complaint . . . would give jurisdictional significance to a feint of language, thereby effectively thwarting the [FSIA's] manifest purpose."  (quoting *Nelson*, 507 U.S. at 363) (cleaned up)).  The act that actually injured Plaintiffs was the attack on the MV Rubymar — not any alleged conduct by or purportedly attributable to COSCO NA.

**B.     The Claims Are Not Based Upon Commercial Activity Imputable to COSCO NA that Caused a "Direct Effect in the United States"**

Absent sufficient allegations of U.S.-based conduct by COSCO NA upon which to base its claims, the Complaint alternatively relies on the third clause of the commercial-activity exception to immunity in § 1605(a)(2).  Under that clause, the Complaint must allege commercial activity outside the United States that "cause[d] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).  Foreign commercial activity may have a "direct" effect in the United States if that effect "follows as an immediate consequence of the defendant's activity."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992) (cleaned up).  The effect must not be "remote and attenuated."  *Valambhia*, 964 F.3d at 1140.  The Complaint's theories fail the directness test.

As an initial matter, the Complaint mistakenly asserts that "the destruction of a vessel owned by a United States national and the consequent financial losses to United States persons" qualifies as a "direct effect" in the United States.  Compl. ¶¶ 13, 92.  It is well settled that "harm to a U.S. citizen, in and of itself, cannot satisfy the direct effect requirement."  *E.g.*, *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 104 F.4th 287, 295 (D.C. Cir. 2024) (citation omitted) (acknowledging that "some financial loss from a foreign tort cannot, standing alone, suffice to trigger the [commercial-activity] exception"); *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 24 (D.D.C. 2000) ("Mere financial loss by a person — individual or corporate — in the U.S. is not, in itself, sufficient to constitute a 'direct effect.'").

In addition, as pointed out above, the Complaint does not allege that any purported conduct *by COSCO NA* — or even alleged booking shipments for U.S. shippers or cessation of bookings to Israel by COSCO (Compl. ¶ 77) — caused the sinking of the MV Rubymar.  The Complaint points instead to "[i] the processing of Iranian oil revenues through Chinese financial institutions outside the U.S., [ii] the supply of missile propellant precursor chemicals, and [iii] the provision

of satellite targeting services." *Id.* ¶ 92.  While the Complaint alleges that its claims (and Plaintiffs' injury) arise from the PRC's orchestration of a "safe passage arrangement" (*id.* ¶¶ 86–91), none of the PRC's alleged conduct, as explained below, can be imputed to COSCO NA.  And even if it could, the "safe passage arrangement" does not constitute commercial activity with a direct effect in the United States.

### 1.    The PRC's Purported Orchestration of the "Safe Passage Arrangement" Cannot Be Imputed to COSCO NA

The Complaint asserts that the PRC is the "architect and director" of the alleged safe-passage arrangement.  Compl. ¶¶ 86–91.  The PRC's alleged commercial activity cannot support an exception to the immunity of COSCO NA, however, because the Complaint does not sufficiently plead that the PRC is the "alter ego" of COSCO NA.  *See id.* ¶¶ 24–27.

In *Bancec*, the Supreme Court held that instrumentalities of a foreign state "established as juridical entities distinct and independent from their sovereign should normally be treated as such." 462 U.S. at 626–27.  This presumption of separateness may be overcome only where (1) the sovereign "so extensively controlled" the entity that a principal-agent relationship was created, or (2) recognizing the entity's separate status "would work fraud or injustice."  *Id*. at 629; *see also TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000) ("[C]ontrol is relevant when it significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary.").  The Complaint's allegations fall short on both prongs.

The Complaint cannot allege the control required by *Bancec*'s first prong merely by alleging that "benefits" of the alleged "safe passage arrangement" "flow directly to the PRC as the ultimate owner and beneficiary of the Chinese state-owned enterprises."  Compl. ¶ 27.  Not only is the Complaint's allegation of control conclusory, beneficial ownership is not, on its own,

–10–

sufficient to demonstrate the requisite level of control.  *See TransAmerica Leasing*, 200 F.3d at 851 (holding that, "as a matter of law," Venezuela's ownership of a shipping company could not "establish the required control") (citing *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 448 (D.C. Cir. 1990) (citation omitted) (endorsing principle that under *Bancec* "100% ownership and appointment of the Board of Directors cannot by themselves force a court to disregard the separateness of the judicial entities")).

Nor is it sufficient that, in addition to state ownership, Chinese Communist Party ("CCP") members allegedly participate in committees at each Chinese Defendant to "oversee operations and ensure compliance with state policies."  Compl. ¶ 25.  At most, the Complaint's allegation reflects a controlling shareholder "exercising its influence, through the Board of Directors"; this is "insufficient to transform parent to principal and instrumentality to agent."  *TransAmerica Leasing,* 200 F.3d at 851 (finding no alter-ego relationship even where Venezuela put one of its naval officers "in charge" of an agency and "[left] to him the task of running 'day-to-day' operations").

Any purported PRC control over COSCO NA is further weakened by its attenuation.  *See Foremost-McKesson*, 905 F.2d at 448 (stating that "attribution is far from straightforward" where the alleged principal/agent relationship "is not a direct one").  As alleged, the PRC controls COSCO NA through the State Council, which controls the CCP Organization Department, which controls, through "executive appointments," the State-owned Assets Supervision and Administration Commission ("SASAC") and the China Investment Corporation ("CIC").  Compl. ¶¶ 29, 48.  SASAC allegedly holds a "controlling position" in COSCO Shipping Holdings (*id.* ¶ 48), which holds COSCO NA (*id.* ¶ 50); at the same time, CIC allegedly holds Central Huijin Investment Ltd. (*id.* ¶¶ 28, 48), which holds China Securities Finance Corporation ("CSFC") (*id.*

–11–

¶ 30), which holds "a significant stake" in COSCO Shipping Holdings (*id.* ¶ 48; see also *id.* ¶ 30), which holds COSCO NA (*id.* ¶ 50).  The Court cannot "presume[] that the interests of a foreign state and its agencies or instrumentalities always are the same," even when only one level removed. *Foremost-McKesson*, 905 F.2d at 448 (addressing attribution analysis where "Iran's alleged control over Pak Dairy was exercised through entities on Pak Dairy's Board, which were in turn allegedly controlled by Iran").  All the more so where, as here, the PRC's interests would have had to be exercised through "a dual-channel state ownership structure" (Compl. ¶ 48) and at least four intervening entities.  *See Uni-Top Asia Inv. Ltd. v. Sinopec Int'l Petro. Expl. & Prod. Corp.*, No. 20-cv-1770, 2022 U.S. Dist. LEXIS 14635, at *8–9 (D.D.C. Jan. 26, 2022) ("[T]he evidence that multiple shareholders hold influence over SIPC weighs against the allegation that any one of them is SIPC's alter ego.").

The Complaint also fails to allege that respecting COSCO NA's separate personality from the PRC "would work fraud or injustice."  *Bancec*, 462 U.S. at 629.  To do so, the Complaint would have to allege that the PRC "abused the corporate form."  *EM Ltd. v. Banco Cent. de la República Argentina*, 800 F.3d 78, 95 (2d Cir. 2015) (distilling "the common thread" from cases applying *Bancec*'s fraud or injustice prong); *see also Gater Assets Ltd. v. Moldovagaz*, 2 F.4th 42, 56 (2d Cir. 2021) ("To meet the fraud or injustice prong it is not sufficient merely to point out an injustice that would result from an adverse decision.  Rather, the plaintiff must show how the sovereign manipulated the instrumentality's corporate form to perpetuate a fraud or injustice." (cleaned up, citation omitted)).  The Complaint's alter-ego allegations center on the economic benefit the PRC allegedly gained from the competitive advantage COSCO NA purportedly received as a result of the supposed "safe passage arrangement."  Compl. ¶¶ 27, 90.  Because the PRC's purported conspiracy with COSCO NA is not alleged to be "based on misuse of the

corporate organizational form," it "is not a 'fraud or injustice' for alter ego purposes." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006).

### 2.    The PRC's Purported Orchestration of the "Safe Passage Arrangement" Is Not Commercial Activity

For purposes of the FSIA's exceptions to sovereign immunity, "commercial" activity involves "actions that the foreign state performs (whatever the motive behind them) [that] are the type of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614 (cleaned up).  Not only does the Complaint fail to allege a basis to somehow impute the PRC's purported conduct to COSCO NA, the Complaint also fails to allege that PRC conduct in connection with the supposed "safe passage arrangement" was commercial activity.

The Complaint elaborates on the PRC's "architect[ure] and direct[ion]" of the alleged "safe passage arrangement" by describing several components of "the enterprise's deliberate design." Compl. ¶ 86–87.  One component was the 2021 China-Iran Comprehensive Strategic Partnership, a "state-level commitment" — i.e., a treaty — that covered "energy, infrastructure, banking, and security cooperation."  *Id.* ¶ 86.  In particular, the Complaint alleges that the treaty covered "cooperation that includes the dual-use satellite and missile guidance capabilities."  *Id.*  The Complaint further points to "joint maritime exercises designated 'Sea Security Belt'" as demonstrating the agreed cooperation between the PRC and Iran.  *Id.* ¶ 87.  The PRC's provision for its national security is an activity of sovereign character, not the function of private parties, and, therefore, not commercial activity.  *Cf. Mwani v. Osama Bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005) (acknowledging that a foreign state's provision of "security" is an "exercise of the powers of police . . . [that] cannot be performed by an individual acting in his own name" (quoting *Nelson*, 507 U.S. at 362)).

–13–

Other components of the alleged "safe passage arrangement" purportedly included the PRC's National Intelligence Law and its Company Law.  Compl. ¶ 88.  The Complaint alleges, moreover, that these laws put in place "structural mechanisms [to] ensure that the conduct of the named Chinese Defendants in purchasing Iranian oil, processing its revenues, supplying missile precursors, and providing satellite access is *not* independent *commercial judgment* but coordinated *state policy* directed by and for the benefit of the PRC."  *Id.* (emphasis added).  As the Supreme Court has observed, legislation is an act that "cannot be performed by an individual acting in his own name. [It] can be performed only by the state acting as such."  *Nelson*, 507 U.S. at 362.  Thus, the PRC's alleged "orchestrat[ion]" of the "systematic arrangement" for safe passage (Compl. ¶ 5) was sovereign activity, not commercial activity.

### 3.  The PRC's Purported Orchestration of the "Safe Passage Arrangement" Did Not Cause a Direct Effect in the United States

The PRC's purported conduct cannot be deemed to have had a "direct effect" in the United States, because nothing "legally significant actually happened in the United States" when the PRC allegedly took the actions alleged in the Complaint. *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988); *see also Bao Ge*, 201 F. Supp. 2d at 25 (granting Chinese government defendants' motion to dismiss for failure to "satisfy the 'direct effect'" test where "all of the legally significant acts giving rise to plaintiffs' claims occurred in China, not in the United States").

Further, any U.S. effect caused by the PRC's foreign conduct cannot be "direct" considering, under the Complaint's apparent theory, the "number of events and actors that intervene between [the PRC's alleged orchestration of the "safe passage arrangement"] and [any harm to Plaintiffs] in America." *Id.*  Under a forgiving construction of the Complaint's allegations: the PRC allegedly entered a "safe-passage arrangement" with the Houthis (Compl. ¶ 89); COSCO NA allegedly booked shipments in reliance on the "safe passage arrangement" (*id.* ¶ 91);

COSCO NA profits flowed through COSCO to its shareholders and, ultimately, to the PRC State Council (*id. ¶¶* 48, 91); the PRC paid Iran for crude oil (*id.* ¶ 93); Iran passed crude oil revenues to the IRGC (*id.* ¶¶ 44, 93); and the IRGC passed on funds and military support to the Houthis (*id.* ¶¶ 44, 84, 93).  The Complaint does not allege the final step, i.e., facts connecting the IRGC's alleged support to the specific Houthi attack on the MV Rubymar.  Even assuming such a causal link, however, the intervening actors and events between the PRC's purported commercial activity and the attack render the PRC's conduct far too "remote and attenuated" to find that it caused a "direct" effect in the United States.  *Valambhia*, 964 F.3d at 1140 (quoting *Weltover*, 504 U.S. at 618).

Damages from the sinking of the MV Rubymar could not have been the "direct effect" of the PRC's alleged "safe passage arrangement" for the simple, additional reason that the ship was attacked before the alleged arrangement had even come into effect.  Specifically, the Complaint alleges that the alleged conspiracy's "results" were "the product of a formal agreement," in Oman, between the PRC and the Houthis on March 21, 2024 — over one month *after* Houthi rebels attacked the MV Rubymar on February 18, 2024.  Compl. ¶¶ 4, 89; *cf. Yang Rong v. Liaoning Province Gov't*, 452 F.3d 883, 891 (D.C. Cir. 2006) (holding that a foreign state's subsequent commercial activity could not satisfy the commercial-activity exception as to claims arising from prior expropriation).

This timing further undermines any inference from the Complaint's allegations that the PRC "direct[ed]" a protection-racket conspiracy.  Compl. ¶ 88; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007) (holding that plaintiff failed to state a claim where the well-pleaded facts were consistent with an "obvious alternative explanation").  The more plausible inference is that COSCO NA — along with "the entire commercial shipping market" — was a victim of the Houthi

"extortion scheme."  Compl. ¶ 71.  As alleged, the attack on the MV Rubymar more likely was "designed to" — and successfully did — "induce compliance" by the PRC and COSCO NA with the Houthis' "protection racket," which the PRC acquiesced to *one month later* in an agreement with the Houthis "to ensure safe passage" through the Red Sea.  *Id.* ¶¶ 71, 89; *see Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (holding that, even where allegations are "consistent with" a plaintiff's theory, "they do not plausibly establish" a well pleaded fact "given more likely explanations").

In addition to the deficiencies described above, any U.S. effect could not be "direct" because it only arose due to Plaintiffs' own subsequent, intervening acts.  A "direct" effect "has no intervening element, but, rather, flows in a straight line without deviation or interruption" from the defendant's alleged activity.  *Bao Ge*, 201 F. Supp. 2d at 24 (quoting *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994)).  Yet the Complaint concedes that Golden Adventure Shipping, S.A., "a Marshall Islands corporation," "owned and operated" the MV Rubymar at the time of the attack (Compl. ¶¶ 2–3), and that Plaintiffs became "the legal successor in interest of Golden Adventure Shipping, S.A." (*id.* ¶ 21).  The Complaint makes plain that Plaintiffs obtained their interest in any claims against COSCO NA from the foreign corporation Golden Adventure Shipping, S.A. through some transaction(s) subsequent to the sinking of the MV Rubymar.  Because that transaction intervened to redirect the effect of the attack on the MV Rubymar from the Marshall Islands to the United States, there is no "direct" effect in the United States.

## II.    THE COMPLAINT FAILS TO SUFFICIENTLY ALLEGE ANY BASIS FOR THIS COURT'S EXERCISE OF PERSONAL JURISDICTION OVER COSCO NA

To survive a motion to dismiss under Rule 12(b)(2), "plaintiffs have the burden of establishing the court's personal jurisdiction over [the defendant]." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008).  Plaintiffs must meet their burden by alleging "specific

facts on which personal jurisdiction can be based." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 31 (D.D.C. 2010).  Plaintiffs "cannot rely on conclusory allegations."  *Id.*  While the Court "must resolve factual discrepancies in the record in favor of" Plaintiffs, the Court "need not treat all of [Plaintiffs'] allegations as true."  *Id.* (internal citations and quotation marks omitted).

The Complaint alleges that this Court has personal jurisdiction over COSCO NA "as provided by the applicable exceptions to the FSIA."  Compl. ¶ 20.  Indeed, taking as true the Complaint's characterization of COSCO NA as an agent or instrumentality of the PRC, the FSIA provides the *only* basis for this Court's personal jurisdiction over COSCO NA.  *See Amerada Hess,* 488 U.S. at 435 n.3 ("Thus, personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605-1607 applies.").  Assuming proper service has been effectuated as required by the FSIA, 28 U.S.C. § 1608(b), this Court may exercise personal jurisdiction over COSCO NA only if the Complaint alleges facts that satisfy an exception to COSCO NA's alleged sovereign immunity.  *See Prac. Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) ("[U]nder the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." (quotation omitted)).  As discussed in Section I, the Complaint alleges no basis to overcome COSCO NA's alleged immunity.

Beyond its reliance upon the FSIA, the Complaint does not purport to allege any basis for this Court's exercise of general personal jurisdiction or specific personal jurisdiction over COSCO NA, a company headquartered in Secaucus, New Jersey, with additional offices in California and Texas.  Compl. ¶ 50.

## III.    THE COMPLAINT FAILS TO STATE A CLAIM AGAINST COSCO NA

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal citation and quotation marks omitted).  These factual

allegations "must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief,'" and must be dismissed. *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Plaintiffs' Complaint suffers from a fatal lack of factual allegations as to COSCO NA and relies on conclusory statements that only mimic the statutory language. Plaintiffs fail to plead supporting facts sufficient to make any claim against COSCO NA "plausible," *Twombly*, 550 U.S. at 570, and, as such, the claims against COSCO NA should be dismissed under Rule 12(b)(6).

### A.    The Complaint Fails to State a Claim Due to Conclusory Group Pleading

As a threshold matter, the Complaint is deficient due to impermissible "group pleading." *See, e.g.*, *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 21 (D.D.C. 2014) (dismissing "for failure to comply with Rule 8" complaint that "referr[ed] to all HSBC defendants collectively throughout the complaint" and "fail[ed] to distinguish between each entity"); *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 85 (D.D.C. 2006) (dismissing RICO claim, including for "generally neglect[ing] to distinguish between the defendants when describing the factual underpinnings of the complaint"); *see also Cheeks v. Fort Myer Constr. Corp.*, 71 F. Supp. 3d 163, 169 (D.D.C. 2014) ("A 'confused and rambling narrative of charges and conclusions concerning numerous persons, organizations and agencies' does not comply with the requirements of Rule 8.").

–18–

Accordingly, Plaintiffs fail to satisfy their pleading burden with the forms of "group pleading" that pervade the Complaint and that seek to impute the conduct of other entities to COSCO NA.  *First*, the Complaint is replete with generalized allegations directed at "Defendants" collectively — or at the contrived subgroup "Chinese Defendants" — without specifying which Defendant allegedly took any particular action.  *See, e.g.*, Compl. ¶ 9 (attributing Plaintiffs' injuries to "Defendants' concerted actions" without distinguishing among seventeen separate entities); *id.* ¶ 67 (alleging extortion carried out by "Chinese Defendants acting as the PRC's instruments" without identifying any act by COSCO NA).  Such conclusory allegations referring to all Defendants as a whole (or a subset of them) do not satisfy Rule 8's requirement that a complaint provide each defendant with fair notice of the claims against it and the grounds upon which they rest.  *See Cheeks,* 71 F. Supp. at 169 (D.D.C. 2014) (holding that, under Rule 8, "[d]efendants are due information about . . . which defendants committed each violation, and when such events occurred"); *see also Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.").

*Second*, the Complaint's allegations concerning COSCO NA are remarkably sparse.  The principal paragraph addressing COSCO NA merely describes COSCO NA as a "regional management subsidiary" headquartered in Secaucus, New Jersey that "governs approximately twenty subsidiaries and joint ventures . . . ."  *Id.* ¶ 50.  The only other substantive references to COSCO NA appear in three places:

- Complaint ¶ 48, which notes that COSCO NA "entered into a National Security Agreement with the U.S. Departments of Homeland Security and Justice in 2018 as a condition of CFIUS approval" for COSCO's acquisition of Orient

> Overseas International Ltd. — a fact indicating COSCO NA's cooperation with the United States government and regulatory transparency, not participation in a criminal racketeering enterprise;

- Complaint ¶ 91, which asserts in conclusory fashion that COSCO NA "received a direct commercial benefit in the United States" from "freight revenues from U.S. importers and exporters served by COSCO Shipping (North America)'s U.S. subsidiaries"; and

- Complaint ¶ 92, which merely lists COSCO NA's "U.S. port, logistics, and shipping agency operations" as a purported basis for FSIA jurisdiction without attributing any allegedly wrongful or tortious act to COSCO NA.

Neither in these terse references nor elsewhere does the Complaint identify a single act taken by COSCO NA to join or further the alleged conspiracy. Because the Complaint fails to allege any facts supporting more than "the mere possibility of misconduct," the claims against COSCO NA should be dismissed. *Iqbal*, 556 U.S. at 678.

## B. The Complaint Fails to State a RICO Claim of Racketeering or Conspiracy

RICO does not apply to the Complaint's groundless claims based on an extraterritorial injury, and the Complaint otherwise fails to state a claim.

### 1. The Complaint Fails to Allege a Domestic Injury

The Complaint fails to state a claim under the RICO statutes (Counts I and II) because the Complaint does not allege a "domestic injury," as required by 18 U.S.C. § 1964(c). *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 354 (2016) ("Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries."). To evaluate the required domestic nexus, courts must "look to the circumstances surrounding the alleged injury to assess whether it arose in the United States."

*Yegiazaryan v. Smagin*, 599 U.S. 533, 543–44 (2023) (suggesting potentially relevant factors including "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity"). This Court considers "where an alleged racketeering scheme was devised, carried out, and directed." *Abernathy v. Carlyle Grp., Inc.*, No. 22-cv-3603, 2024 U.S. Dist. LEXIS 237526, at \*23 (D.D.C. Sep. 27, 2024) (citing *Yegiazaryan*, 599 U.S. at 545–46).

Under the allegations of the Complaint, the nature of Plaintiffs' injury and the alleged racketeering activity that purportedly caused it have no connection to the United States. The "core of [Plaintiffs'] injuries," as observed above in the "gravamen" discussion, is the sinking of the MV Rubymar in international waters thousands of miles from the United States. *Hafez v. Vidino*, No. 24-cv-00873, 2025 U.S. Dist. LEXIS 193423, at \*16–17 (D.D.C. Sep. 30, 2025) (focusing RICO inquiry on place of injury to plaintiff's reputation rather than subsequent financial "effects" of the reputational harm, including lost "professional opportunities" and "freezing of accounts"); *see* Compl. ¶ 117 (identifying the alleged "acts of racketeering activity" as the sinking of the MV Rubymar and "other acts of violence and extortion against commercial shipping"). The strike on the ship was "carried out" in the Red Sea by Houthi rebels in Yemen, allegedly with assistance from Iran; the "safe passage arrangement" supposedly related to the attack was purportedly "devised" and "directed" by the PRC, and subsequently agreed to (albeit after the attack) during diplomatic talks in Oman. *Abernathy*, 2024 U.S. Dist. LEXIS 237526, at \*23; *see, e.g.*, Compl. ¶¶ 85, 86, 89 (alleging the PRC as "architect and director" of conspiracy, suggesting Houthi strike used materials from Iran, and describing circumstances of "formal agreement" to "ensure safe passage").

The Complaint does not allege that the United States or any U.S. person, much less Plaintiffs, were specifically targeted by the purportedly PRC-led conspiracy regarding Iranian oil and Red Sea shipping generally or by the Houthi attack specifically. *See also* Compl. ¶¶ 2, 21, 71 (alleging Houthis' "protection racket" aimed to induce fear in "the global shipping market" and alleging that MV Rubymar was "owned and operated" by a Marshall Islands company).  The allegation that some attenuated downstream benefit of the "safe passage arrangement" purportedly flowed to COSCO NA cannot somehow transform the MV Rubymar's demise in the Red Sea into a domestic injury. *See Yerkyn v. Yakovlevich*, 164 F.4th 224, 230–31 (2d Cir. 2026) (observing that, in determining the place of injury, "'the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved,'" and holding that "Defendants' use of the American financial system to conduct their illicit scheme does not" make an injury domestic) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010)).

A post-injury assignment of claims from a Marshall Islands corporation to a Wyoming corporation also cannot retroactively relocate the injury to the United States. *See Yegiazaryan*, 599 U.S. at 545 (requiring determination whether "the injury *arose* domestically" and rejecting rule that injury, including to intangible property rights, occurs at plaintiff's residence (emphasis added)).  Applying *Yegiazaryan*, this Court has recognized that, where "the bulk of the alleged injury took place [overseas]," the injury is not domestic merely because the United States is "where the money was supposed to end up eventually." *Abernathy*, 2024 U.S. Dist. LEXIS 237526, at *25 (finding no domestic injury where "initially inflicted harm on Plaintiffs in Kuwait continues to cause suffering here in the U.S."); *see also Hafez*, 2025 U.S. Dist. LEXIS 193423, at *17–18

(finding no domestic injury based on plaintiff's relocation to the United States although move was allegedly "a direct *result* of Defendants' actions" that harmed his reputation (emphasis added)).

The Complaint's allegations fail to "ground the injury in the United States," and its RICO claims, both the racketeering claim (Count I) and the conspiracy claim (Count II), should be dismissed. *Yegiazaryan*, 599 U.S. at 535.

### 2.    The Complaint Fails to State a Racketeering Claim Under § 1962(c)

The Complaint's RICO claim for racketeering (Count I) also fails because 18 U.S.C. § 1962(c) requires that a defendant participate in "operation or management" of the enterprise through a "pattern" of racketeering activity — meaning at least two predicate acts within a ten-year period. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); 18 U.S.C. §§ 1961(1), (5).  This requirement creates a "high bar for plaintiffs to plead RICO violations."  *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 14 (D.D.C. 2014).  The Complaint fails to attribute any predicate act to COSCO NA and, in any event, the scant alleged conduct by COSCO NA could not have been the proximate cause of the sinking of the MV Rubymar.

### a.    The Complaint Fails to Allege Any Predicate Act by COSCO NA

The Complaint purports to allege four crimes as predicate acts for finding a pattern of racketeering: (1) Hobbs Act extortion, 18 U.S.C. § 1951; (2) money laundering, 18 U.S.C. §§ 1956, 1957; (3) wire fraud, 18 U.S.C. § 1343; and (4) violence against maritime navigation, 18 U.S.C. § 2280.  *See* Compl. ¶¶ 66–72; 18 U.S.C. § 1961(1).  Not one of these crimes is specifically attributed to COSCO NA.  *See, e.g.*, Compl. ¶¶ 67–69, 71 (attributing Hobbs Act extortion to "COSCO" (COSCO NA's parent), the Houthis, and Iran); *id.* at ¶¶ 70, 95 (attributing money laundering to Chinese banking Defendants' New York branches); *id.* at ¶ 72 (attributing wire fraud to Sinopec, UNIPEC, Agricultural Bank of China, and third-party inspection

companies); *id.* (alleging "named Defendants[]" conspired to enable the attack on the MV Rubymar). Because the Complaint does not allege that COSCO NA itself committed any predicate crime — let alone a "pattern" of such crimes — the Complaint fails to state a RICO claim against COSCO NA.

### b. The Complaint Fails to Allege That Any Act by COSCO NA Proximately Caused Plaintiffs' Injuries Under § 1964(c)

The Complaint's sparse allegations of any COSCO NA conduct fall far short of alleging that any "RICO predicate offense not only was a 'but for' cause of [Plaintiffs'] injury, but was the proximate cause as well." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010) (internal quotation and citation omitted); *see also id.* at 8 (holding that a plaintiff must show that an injury occurred "by reason of" a RICO violation (quoting 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court . . . ."))). In fact, the Complaint has not alleged that any purported COSCO NA conduct was even a "but-for" cause of the MV Rubymar's sinking.

Rather than allege facts showing that COSCO NA's conduct caused *the Houthis'* extortion, the Complaint alleges that the Houthis' extortion and the PRC's purported "safe passage arrangement" caused purportedly wrongful conduct — i.e., "booking and profiting from cargo diverted from extorted competitors" — by *COSCO* (COSCO NA's *parent*). Compl. ¶¶ 1, 50, 77. Not only is the Complaint's inverted causation logic defective, but the allegations about COSCO NA's parent are inapt. Even as to COSCO's cessation of bookings to Israel, the Complaint alleges that COSCO merely sought to shield *itself* from the harm intended in "Houthi threats." *Id.* ¶¶ 48, 77. The Complaint has not alleged any facts attributing COSCO's alleged policy to COSCO NA. Nor does the Complaint link COSCO's commercial pullback to the Houthis' attack on any other shippers' vessels, let alone the MV Rubymar. To the contrary, the

–24–

Complaint alleges that "[t]he Houthis' campaign against commercial shipping" at large was *already underway* before any alleged conduct by COSCO. *E.g.*, *id.* ¶¶ 48, 69, 82 (recounting Houthi hijacking of the MV Galaxy Leader and hostage-taking on November 19, 2023 — months before COSCO's purported January 8, 2024 cessation of bookings to Israel, before the attack on the MV Rubymar, *and* before COSCO's 2024 "surge" in profits purportedly from diverted shipments).

Moreover, in evaluating proximate causation, "the central question . . . is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Rather than a direct relationship between any of COSCO NA's purported conduct and the attack on the MV Rubymar, the Complaint alleges "multiple steps, as well as third-party actions" — including by the PRC, Sinopec, UNIPEC, NIOC, "IRGC-QF," and the Houthis (*see supra* § I), all independent entities outside COSCO NA's control. *Hemi Grp.*, 559 U.S. at 10 (holding that "attenuated" and "purely contingent" causal chain could not show proximate causation); *see also Anza*, 547 U.S. at 458–61 (finding lack of "direct relationship" where causation depended on "actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)"). Any purported causal link here is necessarily "'too remote,' 'purely contingent,' [and] 'indirec[t]'" and, therefore, "insufficient" to allege a RICO claim. *Hemi Grp.*, 559 U.S. at 9.

### 3.    The Complaint Fails to State a Conspiracy Claim Under § 1962(d)

Because the Complaint does not allege a domestic injury, it cannot allege that any Defendant committed a § 1962(c) "violation in which [COSCO NA or any Defendants] could have conspired," and Plaintiffs' RICO conspiracy claim (Count II) must fail. *Papageorge,* 31 F. Supp. 3d at 15. Additionally, RICO conspiracy under § 1962(d) requires the Complaint to allege that "(1) two or more people *agreed* to commit a subsection (c) offense, and (2) [COSCO NA] *agreed*

to further that endeavor." *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,* 682 F.3d 1043, 1047–48 (D.C. Cir. 2012) (emphases added). The Complaint fails to allege any agreement by COSCO NA that could support a RICO conspiracy.

The Complaint does not allege any facts regarding communications or coordination between COSCO NA and the PRC or other co-Defendants related to supposed agreements "to commit" RICO offenses or "to further" the purported endeavor to commit RICO offenses. *Id.* The Complaint's sole basis for implicating COSCO NA in the alleged conspiracy appears to be that COSCO NA "received a direct commercial benefit in the United States" from shipments diverted by the Houthi campaign. Compl. ¶ 91; *see also id* ¶ 120 ("Each named Defendant entered into this agreement by . . . accepting the commercial benefits of the enterprise's racketeering activity."). The D.C. Circuit has rejected this theory, however, declining to infer that a defendant "knew of and agreed to further" an alleged racketeering conspiracy based on allegations that the defendant "knowingly participat[ed] in and benefit[ed] from [professional] fees arising out of the conspiracy." *RSM Prod.*, 682 F.3d at 1051–52 (affirming dismissal) (cleaned up). COSCO NA's purported booking of shipments from U.S. shippers facing Houthi threats "'is more likely explained by' its normal business practice of providing [shipping] services." *Id.* at 1051 (quoting *Iqbal*, 556 U.S. at 680).

Accordingly, the Complaint's RICO claims against COSCO NA should be dismissed.

## C.      The Complaint Fails to State an ATA Claim for Aiding and Abetting

### 1.      Section 2337(2) Bars the Complaint's ATA Claim Against COSCO NA

The Complaint's ATA claim against COSCO NA fails at the threshold because § 2337(2) does not permit ATA claims against foreign states and their agencies or instrumentalities. 18 U.S.C. § 2337(2) ("No action shall be maintained under section 2333 of this title against a foreign state, [or] an agency of a foreign state . . . ."); *see Lawton v. Republic of Iraq*, 581 F. Supp.

2d 43, 46 (D.D.C. 2008) ("A plain reading of § 2337 indicates that the ATA bars § 2333 claims against foreign states."); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 56, 60–61 (D.D.C. 2003) (holding that "§ 2337(2) clearly precludes [plaintiff's] claims under § 2333 against the Libyan state, [and] LESO," its "intelligence service"); *see also Schansman v. Sberbank of Russia PJSC*, 128 F.4th 70, 88 (2d Cir. 2025) (holding that § 2337(2)'s bar to ATA claims against "foreign states" includes "agencies and instrumentalities" as defined in the FSIA). Because COSCO NA is purportedly an agent or instrumentality of the PRC (Compl. ¶¶ 25, 79), the Complaint's ATA claim is barred.

### 2.    The Complaint Does Not Seek Recovery for an Injury to a "National of the United States"

Where applicable, 18 U.S.C. § 2333(a) provides a civil remedy to "any national of the United States injured in his or her person, property, or business" by an act of international terrorism.  *See also* 18 U.S.C. § 2333(d) (conditioning ATA aiding-and-abetting liability on satisfaction of § 2333(a)).  An ATA claim "accrues at the time of injury."  *Litle v. Arab Bank, PLC*, 507 F. Supp. 2d 267, 273 (E.D.N.Y. 2007).  The Complaint's ATA claim does not arise from an injury to "any national of the United States" at the time of the sinking of the MV Rubymar.

By reference to the Immigration and Nationality Act (8 U.S.C. § 1101(a)(22)), the ATA (18 U.S.C. § 2331(2)) defines "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States."  The Complaint alleges that when the MV Rubymar was attacked it was "owned and operated" by Golden Adventure Shipping, S.A., "a Marshall Islands corporation."  Compl. ¶¶ 2, 21.  As a Marshall Islands corporation, Golden Adventure Shipping, S.A. is not citizen of the United States or an entity owing permanent allegiance to the United States, and, therefore, does not qualify as a "national of the United States" under the ATA.

Plaintiffs cannot plead their own direct ATA injury as U.S. nationals, because the Complaint alleges no cognizable legal interest in the MV Rubymar or its operation when the attack occurred.  Wyoming corporation Plaintiff Golden Adventure Shipping Corporation is alleged to be the "legal successor in interest of Golden Adventure Shipping, S.A." (Compl. ¶ 21), but it merely "steps into the shoes" of Golden Adventure Shipping, S.A., which has no ATA claim.  *See La Reunion Aerienne v. Socialist People's Libyan Arab Jamahiriya*, 533 F.3d 837, 844 (D.C. Cir. 2008) (assignee or subrogee "steps into the shoes" of the original claimant and owns the original claimant's substantive right).  Plaintiff Dr. Hassan Chahadeh similarly has no ATA claim himself or derivatively, as he is merely alleged to be the sole shareholder of Plaintiff Golden Adventure Shipping Corporation (Compl. ¶ 22), which has no ATA claim.  The Complaint alleges no other independent injury to either Plaintiff.  *Biton v. Palestinian Interim Self-Government Auth.*, 310 F. Supp. 2d 172, 181 (D.D.C. 2004) (holding that a U.S. national "cannot recover under the ATA" for injury to a person who "was not a U.S. national").

### 3. The Complaint Fails to Allege That the Houthis Were Designated Under U.S. Law as a Foreign Terrorist Organization

The Complaint's aiding-and-abetting claim under the ATA also fails because the ATA requires that "Ansar Allah" (i.e., the Houthis (Compl. ¶ 80)) "had been designated as a foreign terrorist organization ["FTO"] under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which [the attack on the MV Rubymar] was committed, planned, or authorized . . . ."  18 U.S.C. § 2333(d)(2).  *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 483–84 (2023) (acknowledging the FTO-designation "condition" for a "secondary-liability claim").  The Complaint does not satisfy this condition.

The Complaint alleges that Ansar Allah was designated as an FTO on January 22, 2025 — over eleven months *after* the MV Rubymar was struck on February 18, 2024.  *See* Compl. ¶ 83

–28–

(referencing Exec. Order No. 14175, 90 Fed. Reg. 8639 (Jan. 22, 2025) (designating Ansar Allah "consistent with section 219 of the INA (8 U.S.C. 1189)")).  Because aiding and abetting under § 2333(d)(2) is confined to predicate acts of international terrorism by a Foreign Terrorist Organization, designated as such under U.S. law, the statutory precondition for relief under the ATA is not met, and the Complaint fails to state a claim.

### 4.    The Complaint Fails to Allege That COSCO NA Knowingly Provided Substantial Assistance to the Attack on the MV Rubymar

Even beyond the various categorical bars, the Complaint's aiding-and-abetting claim under the ATA still fails.  In *Twitter*, the Supreme Court held that aiding and abetting under § 2333(d)(2) requires that the defendant "consciously and culpably participated" in the specific act of international terrorism alleged.  *Twitter*, 598 U.S. at 506.  Culpability is assessed by considering "in tandem" the requirements of "knowing" and "substantial" assistance, with a "lesser showing of one demanding a greater showing of the other."  *Id.* at 491–92.  In addition, "[w]hen there is a direct nexus between the defendant's acts and the tort, courts may more easily infer such culpable assistance.  But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort."  *Id.* at 506.  The Complaint here fails to allege both a direct nexus between COSCO NA's conduct and the MV Rubymar's sinking, and any "knowing" or "substantial" assistance for the attack.

**Nexus.**  COSCO NA's purported connection to the attack — a thin reed — is primarily as "a commercial beneficiary" of higher revenue "attributed to the 'escalation of the Red Sea situation.'"  Compl. ¶¶ 8, 47.  Such concededly "passive" conduct (*id.* ¶ 48) cannot create a

relevant nexus because, for liability, "the defendant has to take some affirmative act." *Twitter*, 598 U.S. at 490.

The Complaint undertakes to characterize COSCO NA's other alleged conduct as "beyond passive," but this effort also misfires. Compl. ¶ 48. The Complaint acknowledges that COSCO NA's purported "participation in the enterprise's commercial-coercion strategy" was as a *victim* of Houthi extortion and prospective violence. *Id.* Specifically, the Complaint alleges that COSCO's purported "cessation of bookings to Israel, [was] made in explicit *response to Houthi threats*." *Id.* (emphasis added). The Complaint's contorted theory of inverse nexus *from* Houthi threats *to* COSCO's alleged efforts to avoid being attacked is no support for the required connection *from* COSCO NA's purported "substantial assistance" *to* the Houthis and "the act that injured" Plaintiffs. *Twitter*, 598 U.S. at 478. Even a generous reading of the Complaint does not reveal any allegations tying COSCO NA's conduct to the specific attack on the MV Rubymar.

Any nexus theory is unfounded for the additional reason that the alleged "safe passage arrangement" that COSCO NA purportedly "exploited" only came into effect in March 2024, one month *after* the attack on the MV Rubymar. Compl. ¶ 89, 91.

**Culpability.** Because the Complaint fails to allege "any concrete nexus between [COSCO NA's shipping] services and the [MV Rubymar attack]," the Complaint must instead allege that COSCO NA provided "pervasive, systemic, and culpable assistance to a series of terrorist activities [by the Houthis] that could be described as aiding and abetting each [Houthi] terrorist act." *Twitter*, 598 U.S. at 502. Not only does the Complaint fail to meet this heightened bar, the Complaint's culpability allegations are necessarily insufficient, regardless of any supposed nexus between COSCO NA and the MV Rubymar attack, because the Complaint fails to allege that COSCO NA was even "'*generally* aware' of [its supposed] role in [the Houthis'] overall scheme" — much less

that any purported COSCO NA support would be used for a single act of violent extortion. *Id.* at 503–04 (emphasis added).

The Complaint's factual allegations do not support finding that COSCO NA knew it was (purportedly) providing *any* "assistance" to the Houthis. The Complaint alleges that COSCO NA's shipping-revenue dividends, once paid to COSCO, wended their way through higher-level parent entities into PRC state coffers. *See* Compl. ¶¶ 29–30, 48–50. The PRC, purportedly through the independent corporate entity Sinopec and its wholly owned trading arm UNIPEC, paid the National Iranian Oil Company ("NIOC") for crude oil. *E.g.*, *id.* ¶ 42. Some NIOC oil revenues were allegedly allocated to the IRGC; and some NIOC "crude oil deliveries" were allegedly delivered to IRGC-affiliated Khatam al-Anbiya Construction Headquarters. *Id.* ¶ 44. The Complaint makes the conclusory assertion that the "IRGC-QF" "funds, arms, trains, and directs the Houthi organization, providing the ballistic missiles and military support enabling Houthi attacks on commercial shipping." *Id.* Nowhere, however, does the Complaint purport to allege that COSCO NA was aware of any of these subsequent, convoluted transactions by entities unrelated to COSCO NA, or knew that by some hyperextension of the "fungibility principle" its dividends were made "available to the IRGC or IRGC-QF for any purpose, including arming and funding the Houthi proxy" to attack shipping. *Id.* ¶¶ 42, 48.

The Complaint does not allege any communications or coordination between COSCO NA and the IRGC or the Houthis, let alone any stated objective shared between them. The Complaint also does not allege any relationship whatsoever between COSCO NA and any specific IRGC personnel or Houthi personnel, much less the Houthi rebels responsible for the February 18, 2024 strike on MV Rubymar. The Complaint also does not allege that COSCO NA has been designated as a supporter of terrorism. Indeed, COSCO NA's National Security Agreement with the U.S.

Department of Homeland Security and U.S. Department of Justice, and the CFIUS *approval* of COSCO's U.S. "acquisition," suggest that COSCO NA satisfactorily cleared any U.S. "national security considerations." *Id.* ¶ 48. Because any purported nexus between COSCO NA and the MV Rubymar attack is generic and extremely attenuated, and the Complaint does not allege that COSCO NA knew that any of its conduct would supposedly support the Houthi attacks, COSCO NA cannot be liable under the ATA for aiding and abetting. *Twitter*, 598 U.S. at 503–04.

### D.    The Complaint Fails to State a Claim for Tortious Interference

The Complaint's tortious-interference claims (Counts IV and V) must be dismissed because the Complaint invokes only "applicable common law" (Compl. ¶ 1) and does not identify the state law governing the claims, making it "impossible to discern whether the factual allegations are sufficient to state a plausible claim for relief." *Nathan v. Whirlpool Corp.*, 492 F. Supp. 3d 747, 759 (S.D. Ohio 2020); *see Romero v. Flowers Bakeries, LLC*, No. 14-cv-05189, 2016 U.S. Dist. LEXIS 15868, at *34 (N.D. Cal. Feb. 8, 2016) ("[D]ue to variances among state laws, failure to allege which state law governs a common law claim is grounds for dismissal."). By way of example, however, and without conceding its applicability, District of Columbia law would also require dismissal of the Complaint's tortious-interference claims.

To obtain relief under District of Columbia law for tortious interference with contract or with business expectancy, the Complaint must allege: "(1) [the] existence of a valid contractual or other business relationship; (2) [COSCO NA's] knowledge of the relationship; (3) intentional interference with that relationship by [COSCO NA]; and (4) resulting damages." *Econ. Rsch. Servs., Inc. v. ADR Econ., LLC*, 208 F. Supp. 3d 219, 228 (D.D.C. 2016); *see Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986) (stating that "the tort of intentional interference with a prospective business advantage runs 'parallel to that for interference with existing contracts'").

–32–

The Complaint's generalized and conclusory assertions that "Defendants intentionally and unjustifiably interfered with Golden Adventure's contractual performance" and "future maritime commerce" (Compl. ¶¶ 129, 131) are "devoid of specifics" and cannot sustain a tortious-interference claim. *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 177 (D.D.C. 2016); *see Hafez*, 2025 U.S. Dist. LEXIS 193423, at *24 (dismissing intentional-interference claim where "conclusory allegations . . . fail to provide facts suggesting that [defendant] intended to interfere with [plaintiff's] existing or prospective business relationships with particular [counterparties]"). What is more, any alleged business expectancy in "future revenue through the MV Rubymar's remaining useful life" (Compl. ¶ 131) merely refers to "generic opportunities of any successful enterprise," not "specific business opportunities," and is too vague and speculative to support tortious interference. *See Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29–30 (D.C. Cir. 2010).

The Complaint, in any event, does not allege that COSCO NA even knew about, much less intentionally interfered with, Golden Adventure Shipping, S.A.'s alleged shipping contract or business expectancy. The Complaint does not allege that COSCO NA directly threatened Golden Adventure Shipping, S.A. or any other shipper. Nor has the Complaint alleged facts showing COSCO NA's "desire or purpose to interfere" with Golden Adventure Shipping, S.A.'s — or any other shipper's — then-current contracts or expected business relationships. *Rodriguez v. Lab'y Corp. of Am. Holdings*, 13 F. Supp. 3d 121, 134 (D.D.C. 2014) (dismissing tortious-interference claims). As discussed above, the Complaint alleges at most that COSCO NA, through COSCO, attempted to escape "Houthi threats" by avoiding shipments involving Israel, then passively benefited from the "safe passage arrangement" that the PRC agreed to with the Houthis *after* the attack on the MV Rubymar. Compl. ¶ 48. Overlooking any timing and attribution issues,

supposing that *COSCO NA* knew that other shippers could still face *Houthi* threats, "mere awareness that [Plaintiffs] could be adversely affected" is not sufficient to allege intentional interference. *Rodriguez*, 13 F. Supp. 3d at 134. Alleging that COSCO NA had "a general intent to interfere or knowledge that [participation in the PRC's alleged "safe passage arrangement"] *will* injure [Golden Adventure Shipping, S.A.'s] business dealings," would still be insufficient to impose liability. *Id.* (emphasis added).

Accordingly, the Complaint fails to state tortious-interference claims against COSCO NA.

## CONCLUSION

For the foregoing reasons, this Court should grant COSCO NA's motion and should dismiss all claims against COSCO NA with prejudice.

Dated:   July 14, 2026
         Washington, DC

Respectfully submitted,

**WHITE & CASE**

/s/ *Christopher M. Curran*
Christopher M. Curran (D.C. Bar No. 408561)
Nicolle Kownacki (D.C. Bar No. 1005627)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005
Telephone:     + 1 202 626 3600
Facsimile:     + 1 202 639 9355
ccurran@whitecase.com
nkownacki@whitecase.com

*Counsel for COSCO SHIPPING (North America) Inc.*

–34–